### SCHUYLER *v.* CURTIS *et al.*

(*Supreme Court, Special Term, New York County.* September, 1891.)

1. INJUNCTION—WHEN GRANTED—RIGHT TO DAMAGES.
     The granting of an injunction is not limited to a case where damages could be recovered in an action at law.

2. SAME—ERECTING STATUE—PRIVATE CHARACTER—PUBLIC POLICY.
     It is not against public policy to enjoin the making and placing on exhibition of a statue of a decedent who was not a public character.

3. SAME—RIGHT TO PRIVACY.
     A preliminary injunction to restrain the making and public exhibition of a statue of a deceased person will be continued where it is not shown that she was a public character.

At chambers. Action by Philip Schuyler against Ernest Curtis, Alice Donlevy, and others for an injunction. Plaintiff moves for the continuance of a preliminary injunction. Granted.

*James B. Ludlow,* for plaintiff.　　*Walter S. Logan,* for defendants.

O'BRIEN, J. This is a motion for the continuance of a preliminary injunction restraining the defendants from proceeding with a project for making and exhibiting a statue of the late Mrs. George Schuyler, who before her marriage was a Miss Mary M. Hamilton. Mrs. Schuyler had no children; but the plaintiff, who is a nephew and step-son, brings this action in behalf of himself and all her other nearest living relatives. The defendants, except Hartley, who is the sculptor engaged to execute the statue, are members of the "Woman's Memorial Fund Association," which has undertaken to raise money by public subscription for a life-size statue of Mrs. Schuyler, to be designated as the "Typical Philanthropist," and has publicly announced its intention of placing this statue on public exhibition at the Columbian Exposition to be held in Chicago in 1893, as a companion piece to a bust of the well-known agitator, Susan B. Anthony, which bust is to be designated as the "Typical Reformer." Neither Mrs. Schuyler in her life-time, nor her husband after her death, knew or consented to the project; and, in view of the attitude assumed by plaintiff on behalf of her nearest living relatives, it must be concluded that, so far as the family is concerned, the project is unauthorized. The defendants, however, contend that, irrespective of the wishes of the family, they have the right to commemorate her life and worth by a suitable monument, and to that end to receive subscriptions from such of the public as are disposed to give. They therefore contend that this action is not maintainable at all, and if it were, its maintenance is against public policy.

As to the first point, it is urged that an injunction can only be granted in a case where damages could be recovered in an action at law. This objection to the granting of an injunction was raised in *Pollard* v. *Photographic Co.*, 40 Ch. Div. 345, and thus disposed of: "But the counsel for the defendant did not hesitate to contend boldly that no injunction could be granted in a case where there could be no injury to property in respect to which damages could be recovered in an action at law. * * * The right to grant an injunction

does not depend in any way on the existence of property, as alleged, nor is it worth while to consider carefully the grounds upon which the old court of chancery used to interfere by injunction.    But it is quite clear that, independently of any question as to the right at law, the court of chancery always had an original and independent jurisdiction to prevent what that court considered and treated as a wrong, whether arising from a violation of an unquestionable right or from breach of confidence or contract, as pointed out by Lord COTTENHAM in *Prince Albert* v. *Strange*, 1 Macn. & G. 25."

The claim that the maintenance of the action is against public policy is based upon the argument that a recognition of such a right in relatives might prevent the public from erecting statues to Washington, to Lincoln, or to any other great or distinguished man or woman.   I think, however, that the true distinction to be observed is between private and public characters.   The moment one voluntarily places himself before the public, either in accepting public office, or in becoming a candidate for office, or as an artist or literary man, he surrenders his right to privacy *pro tanto*, and obviously cannot complain of any fair or reasonable description or portraiture of himself.   It has not been shown that Mrs. Schuyler ever came within the category of what might be denominated "public characters."   She was undoubtedly a woman of rare gifts and of a broad and philanthropic nature; but these she exercised as a private citizen, in an unobtrusive way.   There is no refutation of the *status* given her by the complaint, which alleges that "she was in no sense either a public character or even a person generally known either in the community in which she lived or throughout the United States, but that her life was pre-eminently the life of a private citizen; that she was a woman of great refinement and cultivation; that notoriety in any form was both extremely distasteful to her and wholly repugnant to her character and disposition; and that throughout her life she neither sought nor desired it in any way."   Such a person, thus described, does not lose her character as a private citizen merely because she engaged in private works of philanthropy.   It is sometimes difficult to determine in individual cases when one ceases to be a private and becomes a public character.   This, however, does not destroy the value of the distinction, nor the grounds upon which it can be supported.   It is equally difficult to apply to individual cases the principle of the reasonableness or unreasonableness of certain acts.   As stated, therefore, it not having been shown that Mrs. Schuyler was a public character, her relatives have a right to intervene.   It is true that there is no reported decision which goes to this extent in maintaining the right of privacy, and in that respect this is a novel case.   But the gradual extension of the law in the direction of affording the most complete redress for injury to individual rights makes this an easy step from reported decisions much similar in principle.   In a recent article of the Harvard Law Review, (Dec. 1890, vol. 4, No. 5,) entitled "The Right to Privacy," we find an able summary of the extension and development of the law of individual rights, which well deserves and will repay the perusal of every lawyer. Among other things it says: "This development of the law was inevitable. The intense intellectual and emotional life, and the heightening of sensations, which came with the advance of civilization, made it clear to men that only a part of the pain, pleasure, and profit of life lay in physical things.   Thoughts, emotions, and sensations demanded legal recognition, and the beautiful capacity for growth which characterizes the common law enabled the judges to afford the requisite protection without the interposition of the legislature. Recent inventions and business methods call attention to the next step which must be taken for the protection of the person, and for securing to the individual what Judge COOLEY calls the 'right to be let alone.'   Instantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed

from the house-top.' For years there has been a feeling that the law must afford some remedy for the unauthorized circulation of portraits of private persons; and the evil of the invasion of privacy by the newspapers, long keenly felt, has been but recently discussed by an able writer." Scribner's Magazine, July, 1890, "The Rights of the Citizen to his Reputation," by E. L. Godkin, Esq., pp. 65, 67. *Manola* v. *Stevens*, decided by this court in June, 1890, (not reported,) involved the consideration of the right to circulate portraits. The plaintiff alleged that while playing in the Broadway Theater, in a role which required her appearance in tights, she was, by means of a flash light, photographed surreptitiously, and without her consent, from one of the boxes of the theater. It is true there was no opposition to the preliminary injunction being made permanent; but this court issued one to restrain any use being made of the pictures so taken. *Pollard* v. *Photographic Co.*, already referred to, is another instance where an injunction was issued against the unauthorized exhibition or sale of photographs or other likenesses of private persons. These and the celebrated English case of *Prince Albert* v. *Strange*, 2 De Gex & S. 652, on appeal, 1 Macn. & G. 25, are a clear recognition (as shown by the article in the Harvard Law Review, supra) of the principle that the right to which protection is given is the right to privacy.

Upon the facts presented on the motion, and the law applicable thereto, the motion to continue injunction until the trial should be granted.