## PAVESICH v. NEW ENGLAND LIFE INSURANCE CO. et al.

1. The absence, for a long period of time, of a precedent for an asserted right is not conclusive evidence that the right does not exist. Where the case is new in principle, the courts can not give a remedy; but where the case is new only in instance, it is the duty of the courts to give relief by the application of recognized principles.

2. A right of privacy is derived from natural law, recognized by municipal law, and its existence can be inferred from expressions used by commentators and writers on the law as well as by judges in decided cases.

3. The right of privacy is embraced within the absolute rights of personal security and personal liberty.

4. Personal security includes the right to exist and the right to the enjoyment of life while existing, and is invaded not only by a deprivation of life, but also by a deprivation of those things which are necessary to the enjoyment of life according to the nature, temperament, and lawful desires of the individual.

5. Personal liberty includes not only freedom from physical restraint, but also the right " to be let alone," to determine one's mode of life, whether it shall

be a life of publicity or of privacy, and to order one's life and manage one's affairs in a manner that may be most agreeable to him, so long as he does not violate the rights of others or of the public.

6. Liberty of speech and of the press, when exercised within the bounds of the constitutional guaranties, are limitations upon the exercise of the right of privacy.

7. The constitution declares that the liberty of speech and of the press must not be abused ; and the law will not permit the right of privacy to be asserted in such a way as to curtail or restrain such liberties. The one may be used to keep the other within lawful bounds, but neither can be lawfully used to destroy the other.

8. The right of privacy may be waived either expressly or by implication, except as to those matters which law or public policy demands shall be kept private ; but a waiver authorizes an invasion of the right only to such an extent as is necessarily to be inferred from the purpose for which the waiver is made. A waiver for one purpose and in favor of one person or class does not authorize an invasion for all purposes or by all persons and classes.

9. One who seeks public office, or any person who claims from the public approval or patronage, waives his right of privacy to such an extent that he can not restrain or impede the public in any proper investigation into the conduct of his private life which may throw light upon the question as to whether the public should bestow upon him the office which he seeks, or a cord to him the approval or patronage which he asks. The holder of public office makes a waiver of a similar nature and subjects his life at all times to closest scrutiny, in order that it may be determined whether the rights of the public are safe in his hands.

10. The conclusion and reasoning of the majority in the case of Roberson *v*. Rochester Folding Box Company, 171 N. Y. 540, criticised and disapproved, and the reasoning of Judge Gray in his dissenting opinion adopted and followed.

11. The publication of a picture of a person, without his consent, as a part of an advertisement, for the purpose of exploiting the publisher's business, is a violation of the right of privacy of the person whose picture is reproduced, and entitles him to recover without proof of special damage.

12. The publication of one's picture, without his consent, for such a purpose is in no sense an exercise of the liberty of speech or of the press, within the meaning of those terms as used in the constitution.

13. Words which are harmless in themselves may be libelous in the light of extrinsic facts.

14. A publication which imputes to one language which is known to those among whom he lives to contain statements which are false is libelous.

15. A publication of an advertisement of an insurance company, containing a person's picture and a statement that the person has policies of insurance with the company and is pleased with his investment, when in fact he has no such policies, is libelous as having a tendency to create the impression, among those who know the facts, that the person whose picture is reproduced has told a wilful falsehood, either gratuitously or for a consideration.

16. The petition was good as against a general demurrer, and the objections raised in the special demurrer were without merit.

Argued February 3,—Decided March 3, 1905.

Action for damages.   Before Judge Reid.   City court of Atlanta.
May 14, 1904.

Paolo Pavesich brought an action against the New England
Mutual Life Insurance Company, a non-resident corporation,
Thomas B. Lumpkin, its general agent, and J. Q. Adams, a photog-
rapher, both residing in the city of Atlanta.   The allegations of
the petition were, in substance, as follows:   In an issue of the At-
lanta Constitution, a newspaper published in the city of Atlanta,
there appeared a likeness of the plaintiff, which would be easily
recognized by his friends and acquaintances, placed by the side of
the likeness of an ill-dressed and sickly looking person.   Above
the likeness of the plaintiff were the words, "Do it now.   The
man who did."   Above the likeness of the other person were the
words, " Do it while you can.   The man who didn't."   Below the
two pictures were the words, "These two pictures tell their own
story."   Under the plaintiff's picture the following appeared : " In
my healthy and productive period of life I bought insurance in
the New England Mutual Life Insurance Co., of Boston, Mass.,
and to-day my family is protected and I am drawing an annual
dividend on my paid-up policies."   Under the other person's pic-
ture was a statement to the effect that he had not taken insur-
ance, and now realized his mistake.   The statements were signed,
" Thomas B. Lumpkin, General Agent."   The picture of the plain-
tiff was taken from a negative obtained by the defendant Lump-
kin, or some one by him authorized, from the defendant Adams,
which was used with his consent and with knowledge of the pur-
pose for which it was to be used.   The picture was made from
the negative without the plaintiff's consent, at the instance of the
defendant insurance company, through its agent Lumpkin.
Plaintiff is an artist by profession, and the publication is pecu-
liarly offensive to him.   The statement attributed to plaintiff in
the publication is false and malicious.   He never made any such
statement, and has not and never has had a policy of life-insur-
ance with the defendant company.   The publication is malicious
and tends to bring plaintiff into ridicule before the world, and
especially with his friends and acquaintances who know that he
has no policy in the defendant company.   The publication is " a
trespass upon plaintiff's right of privacy, and was caused by
breach of confidence and trust reposed " in the defendant Adams.

The prayer was for damages in the sum of $25,000. The petition was demurred to generally, and specially on the grounds that there was a misjoinder of defendants and causes of action; that no facts were set forth from which malice can be inferred; and that no special damages were alleged. The court sustained the general demurrer, and the plaintiff excepted.

*Westmoreland Brothers* and *M. M. Hirsch*, for plaintiff.

*John L. Hopkins & Sons*, for defendants.

COBB, J. 1-12. The petition really contains two counts; one for a libel, and the other for a violation of the plaintiff's right of privacy. There was no special demurrer raising the objection that the counts were not properly arranged, as there was in *Cooper* v. *Portner Brewing Company*, 112 *Ga.* 894; and hence the petition is to be dealt with in relation to its substance, without reference to its form. We will first deal with the general demurrer to the second count, which claimed damages on account of an alleged violation of the plaintiff's right of privacy. The question, therefore, to be determined is whether an individual has a right of privacy which he can enforce and which the courts will protect against invasion. It is to be conceded that prior to 1890 every adjudicated case, both in this country and in England, which might be said to have involved a right of privacy, was not based upon the existence of such right, but was founded upon a supposed right of property, or a breach of trust or confidence, or the like; and that therefore a claim to a right of privacy, independent of a property or contractual right or some right of a similar nature, had, up to that time, never been recognized in terms in any decision. The entire absence for a long period of time, even for centuries, of a precedent for an asserted right should have the effect to cause the courts to proceed with caution before recognizing the right, for fear that they may thereby invade the province of the lawmaking power; but such absence, even for all time, is not conclusive of the question as to the existence of the right. The novelty of the complaint is no objection when an injury cognizable by law is shown to have been inflicted on the plaintiff. In such a case "although there be no precedent, the common law will judge according to the law of nature and the public good." Where the case is new in principle, the courts have no authority to give a remedy, no matter

how great the grievance; but where the case is only new in instance, and the sole question is upon the application of a recognized principle to a new case, "it will be just as competent to courts of justice to apply the principle to any case that may arise two centuries hence as it was two centuries ago." Broom's Legal Maxims (8th ed.), 193. This results from the application of the maxim *ubi jus ibi remedium*, which finds expression in our code, where it is declared that "For every right there shall be a remedy, and every court having jurisdiction of the one may, if necessary, frame the other." Civil Code, § 4929. The individual surrenders to society many rights and privileges which he would be free to exercise in a state of nature, in exchange for the benefits which he receives as a member of society. But he is not presumed to surrender all those rights, and the public has no more right, without his consent, to invade the domain of those rights which it is necessarily to be presumed he has reserved than he has to violate the valid regulations of the organized government under which he lives. The right of privacy has its foundation in the instincts of nature. It is recognized intuitively, consciousness being the witness that can be called to establish its existence. Any person whose intellect is in a normal condition recognizes at once that as to each individual member of society there are matters private and there are matters public so far as the individual is concerned. Each individual as instinctively resents any encroachment by the public upon his rights which are of a private nature as he does the withdrawal of those of his rights which are of a public nature. A right of privacy in matters purely private is therefore derived from natural law. This idea is embraced in the Roman's conception of justice, which "was not simply the external legality of acts, but the accord of external acts with the precepts of the law prompted by internal impulse and free volition." McKeldey's Roman Law (Dropsie), § 123. It may be said to arise out of those laws sometimes characterized as *immutable*, "because they are natural, and so just at all times, and in all places, that no authority can either change or abolish them." 1 Domat's Civil Law, by Strahan (Cushing's ed.), 49. It is one of those rights referred to by some law-writers as *absolute*; "such as would belong to their persons merely in a state of nature, and which every man is entitled to enjoy, whether out of society or in it." 1 Bl. 123.

Among the absolute rights referred to by the commentator just cited is the right of personal security and the right of personal liberty. In the first is embraced a person's right to a "legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation;" and in the second is embraced "the power of locomotion, of changing situation, or moving one's person to whatsoever place one's own inclination may direct, without imprisonment or restraint, unless by due course of law." 1 Bl. 129, 134. While neither Sir William Blackstone nor any of the other writers on the principles of the common law have referred in terms to the right of privacy, the illustrations given by them as to what would be a violation of the absolute rights of individuals are not to be taken as exhaustive, but the language should be allowed to include any instance of a violation of such rights which is clearly within the true meaning and intent of the words used to declare the principle. When the law guarantees to one the right to the enjoyment of his life, it gives to him something more than the mere right to breathe and exist. While of course the most flagrant violation of this right would be deprivation of life, yet life itself may be spared and the enjoyment of life entirely destroyed. An individual has a right to enjoy life in any way that may be most agreeable and pleasant to him, according to his temperament and nature, provided that in such enjoyment he does not invade the rights of his neighbor or violate public law or policy. The right of personal security is not fully accorded by allowing an individual to go through life in possession of all of his members and his body unmarred; nor is his right to personal liberty fully accorded by merely allowing him to remain out of jail or free from other physical restraints. The liberty which he derives from natural law, and which is recognized by municipal law, embraces far more than freedom from physical restraint. The term *liberty* is not to be so dwarfed, "but is deemed to embrace the right of a man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. Liberty, in its broad sense, as understood in this country, means the right, not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in

any lawful calling, and to pursue any lawful trade or avocation."
See Brannon on Fourteenth Amendment, 111. Liberty includes
the right to live as one will, so long as that will does not inter-
fere with the rights of another or of the public.    One may desire
to live a life of seclusion; another may desire to live a life of
publicity; still another may wish to live à life of privacy as to
certain matters and of publicity as to others.    One may wish to
live a life of toil where his work is of a nature that keeps him
constantly before the public gaze; while another may wish to live
a life of research and contemplation, only moving before the
public at such times and under such circumstances as may be
necessary to his actual existence.    Each is entitled to a liberty of
choice as to his manner of life, and neither an individul nor the
public has a right to arbitrarily take away from him his liberty.
See, in this connection, Cyc. Law Dic. (Shumaker & Longsdorff),
and Bouvier's Law Dic. tit. *liberty*.

All will admit that the individual who desires to live a life of
seclusion can not be compelled, against his consent, to exhibit his
person in any public place, unless such exhibition is demanded by
the law of the land.    He may be required to come from his place
of seclusion to perform public duties, — to serve as a juror and to
testify as a witness, and the like; but when the public duty is
once performed, if he exercises his liberty to go again into seclu-
sion, no one can deny him the right.    One who desires to live a
life of partial seclusion has a right to choose the times, places, and
manner in which and at which he will submit himself to the pub-
lic gaze.    Subject to the limitation above referred to, the body of
a person can not be put on exhibition at any time or at any place
without his consent.    The right of one to exhibit himself to the
public at all proper times, in all proper places, and in a proper
manner is embraced within the right of personal liberty.    The
right to withdraw from the public gaze at such times as a person
may see fit, when his presence in public is not demanded by any
rule of law is also embraced within the right of personal liberty.
Publicity in one instance and privacy in the other is each guaran-
teed.    If personal liberty embraces the right of publicity, it no less
embraces the correlative right of privacy; and this is no new idea
in Georgia law.    In *Wallace* v. *Railway Company*, 94 *Ga*. 732,
it was said: "Liberty of speech and of writing is secured by the

constitution, and incident thereto is the correlative liberty of silence, not less important nor less sacred." The right of privacy within certain limits is a right derived from natural law, recognized by the principles of municipal law, and guaranteed to persons in this State by the constitutions of the United States and of the State of Georgia, in those provisions which declare that no person shall be deprived of liberty except by due process of law.

While in reaching the conclusion just stated we have been deprived of the benefit of the light that would be shed on the question by decided cases and utterances of law-writers directly dealing with the matter, we have been aided by many side-lights in the law. The *injuria* of the Roman law, sometimes translated *injury* and at other times *outrage*, and which is generally understood at this time to convey the idea of legal wrong, was held to embrace many acts resulting in damage for which the law would give redress. It embraced all of those wrongs which were the result of a direct invasion of the rights of the person and the rights of property which are enumerated in all of the commentaries on the common law, and which are so familiar to every one at this time. But it included more. An outrage was committed not only by striking with the fists, or with the club or lash, but also by shouting until a crowd gathered around one; and it was an outrage, or legal wrong, to merely follow an honest woman or young boy or girl; and it was declared in unequivocal terms that these illustrations were not exhaustive, but that an injury or legal wrong was committed "by numberless other acts." Sandar's Just. (Hammond's ed.) 499; Poste's Inst. Gaius (3d ed.), 449. The punishment of one who had not committed any assault upon another or impeded in any way his right of locomotion, but who merely attracted public attention to the other as he was passing along a public highway or standing upon his private grounds, evidences the fact that the ancient law recognized that a person had a legal right "to be let alone," so long as he was not interfering with the rights of other individuals or of the public. This idea has been carried into the common law, and appears from time to time in various places, a conspicuous instance being in the case of private nuisances resulting from noise which interferes with one's enjoyment of his home, and this too where the noise is the result of the carrying on of a lawful occupation. Even in such cases

where the noise is unnecessary, or is made at such times that one would have a right to quiet, the courts have interfered by injunction in behalf of the person complaining.    See 2 Wood on Nuisances (3d ed.), 827 et seq.    It is true that these cases are generally based upon the ground that the noise is an invasion of a property right, but there is really no injury to the property, and the gist of the wrong is that the individual is disturbed in his right to have quiet.    Under the Roman law, "to enter a man's house against his will, even to serve a summons, was regarded as an invasion of his *privacy.*"    Hunter's Roman Law (3d ed.), 149. This conception is the foundation of the common-law maxim that "every man's house is his castle;" and in Semayne's case (5 Coke, 91), 1 Smith's Lead. Cas. 228, where this maxim was applied, one of the points resolved was "That the house of every one is to him as his castle and fortress, as well for his defence against injury and violence as for *his repose.*"    "Eavesdroppers, or such as listen under walls or windows or the eaves of a house to hearken after discourse, and thereupon to frame slanderous and mischievous tales," were a nuisance at common law and indictable, and were required, in the discretion of the court, to find sureties for their good behavior.    4 Bl. 168.    The offense consists in lingering about dwelling-houses and other places where persons meet for private intercourse, and listening to what is said, and then tattling it abroad.    10 Am. & Eng. Enc. L. (2d ed.) 440.    A common scold was at common law indictable as a public nuisance to her neighborhood.    4 Bl. 168.    And the reason for the punishment of such a character was not the protection of any property right of her neighbors, but the fact that her conduct was a disturbance of their right to quiet and repose, the offense being complete even when the party indicted committed it upon her own premises.    Instances might be multiplied where the common law has both tacitly and expressly recognized the right of an individual to repose and privacy.    The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, which is so fully protected in the constitutions of the United States and of this State (Civil Code, §§ 6017, 5713), is not a right *created* by these instruments, but is an ancient right which, on account of its gross violation at different times, was preserved from such attacks in the future by being made the subject

of constitutional provisions.    The right to search the papers or
houses of another for the purpose of enforcing a claim of one in-
dividual against another in a civil proceeding, or in the mainte-
nance of a mere private right, was never recognized at common law,
but such search was confined entirely to cases of public prosecu-
tions; and even in those cases the legality of the search was for-
merly doubted, and it has been said that it crept into the law by
imperceptible practice.    25 Am. & Eng. Enc. L. (2d ed.) 145.
The refusal to allow such search as an aid to the assertion of a
mere private right, and its allowance sparingly to aid in maintain-
ing the rights of the public, is an implied recognition of the exist-
ence of a right of privacy; for the law on the subject of unreason-
able searches can not be based upon any other principle than the
right of a person to be secure from invasion by the public into
matters of a private nature which can only be properly termed his
right of privacy.

The right of privacy, however, like every other right that rests
in the individual, may be waived by him, or by any one authorized
by him, or by any one whom the law empowers to act in his be-
half, provided the effect of his waiver will not be such as to bring
before the public those matters of a purely private nature which
express law or public policy demands shall be kept private.    This
waiver may be either express or implied, but the existence of the
waiver carries with it the right to an invasion of privacy only to
such an extent as may be legitimately necessary and proper in
dealing with the matter which has brought about the waiver.    It
may be waived for one purpose and still asserted for another; it
may be waived in behalf of one class and retained as against
another class; it may be waived as to one individual and retained
as against all other persons.    The most striking illustration of a
waiver is where one either seeks or allows himself to be presented
as a candidate for public office.    He thereby waives any right to
restrain or impede the public in any proper investigation into the
conduct of his private life which may throw light upon his quali-
fications for the office or the advisability of imposing upon him the
public trust which the office carries.    But even in this case the
waiver does not extend into those matters and transactions of pri-
vate life which are wholly foreign and can throw no light whatever
upon the question as to his competency for the office or the pro-

priety of bestowing it upon him. One who holds public office makes a waiver of a similar character, that is, that his life may be subjected at all times to the closest scrutiny in order to determine whether the rights of the public are safe in his hands; but beyond this the waiver does not extend.    So it is in reference to those belonging to the learned professions, who by their calling place themselves before the public and thereby consent that their private lives may be scrutinized for the purpose of determining whether it is to the interest of those whose patronage they seek to place their interests in their hands.    In short, any person who engages in any pursuit or occupation or calling which calls for the approval or patronage of the public submits his private life to examination by those to whom he addresses his call, to any extent that may be necessary to determine whether it is wise and proper and expedient to accord to him the approval or patronage which he seeks.

It may be said that to establish a liberty of privacy would involve in numerous cases the perplexing question to determine where this liberty ended and the rights of others and of the public began.    This affords no reason for not recognizing the liberty of privacy and giving to the person aggrieved legal redress against the wrong-doer in a case where it is clearly shown that a legal wrong has been done.    It may be that there will arise many cases which lie near the border line which marks the right of privacy on the one hand and the right of another individual or of the public on the other.    But this is true in regard to numerous other rights which the law recognizes as resting in the individual.    In regard to cases that may arise under the right of privacy, as in cases that arise under other rights where the line of demarkation is to be determined, the safeguard of the individual on the one hand and of the public on the other is the wisdom and integrity of the judiciary. Each person has a liberty of privacy, and every other person has as against him liberty in reference to other matters, and the line where these liberties impinge upon each other may in a given case be hard to define; but that such a case may arise can afford no more reason for denying to one his liberty of privacy than it would to deny to another his liberty, whatever it may be.    In every action for a tort it is necessary for the court to determine whether the right claimed has a legal existence, and for the jury to determine whether such right has been

invaded, and to assess the damage if their finding is in favor of the plaintiff. This burden which rests upon the court in every case of the character referred to is all that will be imposed upon it in actions brought for a violation of the right of privacy. No greater difficulties will be encountered in such cases in determining the existence of the right than often will be encountered in determining the existence of other rights sought to be enforced by action. The courts may proceed in cases involving the violation of a right of privacy as in other cases of a similar nature, and the juries may in the same manner proceed to a determination of those questions which the law requires to be submitted for their consideration. With honest and fearless trial judges to pass in the first instance upon the question of law as to the existence of the right in each case, whose decisions are subject to review by the court of last resort, and with fair and impartial juries to pass upon the questions of fact involved and assess the damages in the event of a recovery, whose verdict is, under our law, in all cases subject to supervision and scrutiny by the trial judge, who may, within the limits of a legal discretion, control their findings, there need be no more fear that the right of privacy will be the occasion of unjustifiable litigation, oppression, or wrong than that the existence of many other rights in the law would bring about such results.

The liberty of privacy exists, has been recognized by the law, and is entitled to continual recognition. But it must be kept within its proper limits, and in its exercise must be made to accord with the rights of those who have other liberties, as well as the rights of any person who may be properly interested in the matters which are claimed to be of purely private concern. Publicity in many cases is absolutely essential to the welfare of the public. Privacy in other matters is not only essential to the welfare of the individual, but also to the well-being of society. The law stamping the unbreakable seal of privacy upon communications between husband and wife, attorney and client, and similar provisions of the law, is a recognition, not only of the right of privacy, but that for the public good some matters of private concern are not to be made public even with the consent of those interested. It therefore follows from what has been said that a violation of the right of privacy is a direct invasion of a legal

right of the individual. It is a tort, and it is not necessary that special damages should have accrued from its violation in order to entitle the aggrieved party to recover. Civil Code, § 3807. In an action for an invasion of such right the damages to be recovered are those for which the law authorizes a recovery in torts of that character; and if the law authorizes a recovery of damages for wounded feelings in other torts of a similar nature, such damages would be recoverable in an action for a violation of this right.

The stumbling block which many have encountered in the way of a recognition of the existence of a right of privacy has been that the recognition of such right would inevitably tend to curtail the liberty of speech and of the press. The right to speak and the right of privacy have been coexistent. Each is a natural right, each exists, and each must be recognized and enforced with due respect for the other. The right to convey one's thoughts by writing or printing grows out of but does not enlarge in any way the natural right of speech; it simply authorizes one to take advantage of those mediums of expression which the ingenuity of man has contrived for broadening and making more effective the influences of that which was formerly confined to mere oral utterances. The right to speak and write and print has been, at different times in the world's history, seriously invaded by those who, for their own selfish purposes, desired to take away from others such privileges, and consequently these rights have been the subject of provisions in the constitutions of the United States and of this State. The constitution of the United States prohibits Congress from passing any law "abridging the freedom of speech or of the press." Civil Code, § 6014. The constitution of this State declares, "No law shall ever be passed to curtail or restrain the liberty of speech or of the press." Judge Cooley says: "The constitutional liberty of speech and of the press, as we understand it, implies a right to freely utter and publish whatever the citizen may please, and to be protected against any responsibility for so doing, except so far as such publications, from their blasphemy, obscenity, or scandalous character, may be a public offense, or as by their falsehood and malice they may injuriously affect the standing, reputation, or pecuniary interests of individuals. Or, to state the same thing in somewhat different words, we understand liberty of speech and of the press to imply

not only liberty to publish, but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords. For these standards we must look to the common-law rules which were in force when the constitutional guaranties were established, and in reference to which they have been adopted." Cool. Con. Lim. (5th ed.) 521. In Rex. v. St. Asaph, 3 Term Rep. 428, Lord Mansfield said: "The liberty of the press consists in printing without any previous license, subject to the consequence of law." Chancellor Kent, while Judge of the Supreme Court of New York, in People v. Croswell, 3 John. Cas. 336, 394, adopted, as a definition of the phrase "liberty of the press," what was said by General Hamilton in his brief in that case, where it was set forth that " the liberty of the press consists in the right to publish, with impunity, truth, with good motives, and for justifiable ends, whether it respects government, magistracy, or individuals;" and the learned jurist declared that this definition was perfectly correct, comprehensive, and accurate. Mr. Justice Story defined the phrase to mean "that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so, always, that he does not injure any other person in his rights, person, property, or reputation; and so, always, that he does not thereby disturb the public peace or attempt to subvert the government." Story, Const. § 1880. See also 18 Am. & Eng. Enc. Law (2d ed.), 1125.

The constitution of this State declares what is meant by liberty of speech and liberty of the press, in the following words: " Any person may speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Civil Code, § 5712. The right preserved and guaranteed against invasion by the constitution is therefore the right to utter, to write, and to print one's sentiments, subject only to the limitation that in so doing he shall not be guilty of an abuse of this privilege by invading the legal rights of others. The constitution uses the word *sentiments*, but it is used in the sense of thoughts, ideas, opinions. To make intelligent, forceful, and effective an expression of opinion it may be necessary to refer to the life, conduct, and character of a person; and so long as the truth is adhered to, the right of

privacy of another can not be said to have been invaded by one who speaks or writes or prints, provided the reference to such person and the manner in which he is referred to is reasonably and legitimately proper in an expression of opinion on the subject that is under investigation. It will therefore be seen that the right of privacy must in some particulars yield to the right of speech and of the press. It is well recognized that slander is an abuse of the liberty of speech, and that a libel is an abuse of the liberty to write and print; but it is nowhere expressly declared in the law that these are the only abuses of such rights. And that the law makes the truth in suits for slander and in prosecutions and suits for libel a complete defense may not necessarily make the publication of the truth the legal right of every person, nor prevent it from being in some cases a legal wrong. The truth may be spoken, written, or printed about all matters of a public nature, as well as matters of a private nature in which the public has a legitimate interest. The truth may be uttered and printed in reference to the life, character, and conduct of individuals whenever it is necessary to the full exercise of the right to express one's sentiments on any and all subjects that may be proper matter for discussion. But there may arise cases where the speaking or printing of the truth might be considered an abuse of the liberty of speech and of the press; as, in a case where matters of purely private concern, wholly foreign to a legitimate expression of opinion on the subject under discussion, are injected into the discussion for no other purpose and with no other motive than to annoy and harass the individual referred to. Such cases might be of rare occurrence; but if such should arise, the party aggrieved may not be without a remedy. The right of privacy is unquestionably limited by the right to speak and print. It may be said that to give liberty of speech and of the press such wide scope as has been indicated would impose a very serious limitation upon the right of privacy; but if it does, it is due to the fact that the law considers that the welfare of the public is better subserved by maintaining the liberty of speech and of the press than by allowing an individual to assert his right of privacy in such a way as to interfere with the free expression of one's sentiments and the publication of every matter in which the public may be legitimately interested. In many cases the

law requires the individual to surrender some of his natural and private rights for the benefit of the public; and this is true in reference to some phases of the right of privacy as well as other legal rights. Those to whom the right to speak and write and print is guaranteed must not abuse this right; nor must one in whom the right of privacy exists abuse this right. The law will no more permit an abuse by the one than by the other. Liberty of speech and of the press is and has been a useful instrument to keep the individual within limits of lawful, decent, and proper conduct; and the right of privacy may be well used within its proper limits to keep those who speak and write and print within the legitimate bounds of the constitutional guaranties of such rights. One may be used as a check upon the other; but neither can be lawfully used for the other's destruction.

There is nothing in the ruling made in the present case to conflict with the decision in *Chapman* v. *Telegraph Company*, 88 *Ga.* 763. It was held in that case that in an action against a telegraph company for a failure to deliver a message in due time, thereby preventing the sender from going to the bedside of his sick brother, damages on account of mental pain and suffering could not be recovered. The effect of that decision is simply that in an action upon a contract, or in an action sounding in tort for a breach of duty growing out of the contract, damages for mental pain and suffering can not be recovered, when no other damages have been sustained. Mr. Justice Lumpkin, in his opinion, distinctly recognizes that where there has been an invasion of a right from which the law would presume damages to flow, additional damages for pain and suffering might be recovered.

It seems that the first case in this country where the right of privacy was invoked as a foundation for an application to the courts for relief was the unreported case of Manola *v.* Stevens, which was an application for injunction to the Supreme Court of New York, filed on June 15, 1890. The complainant alleged that while she was playing in the Broadway Theatre, dressed as required by her role, she was, by means of a flash-light, photographed surreptiously and without her consent, from one of the boxes by the defendant; and she prayed that an injunction issue to restrain the use of the photograph. An interlocutory injunction was granted ex parte. At the time set for a hearing there was

no appearance for the defendant, and the injunction was made permanent. See 4 Harv. Law Rev. 195 (note 7). The article in this magazine which refers to the case above mentioned appeared in 1890, and was written by Samuel D. Warren and Lewis D. Brandeis. In it the authors ably and forcefully maintained the existence of a right of privacy, and the article attracted much attention at the time. It was conceded by the authors that there was no decided case in which the right of privacy was distinctly asserted and recognized, but it was asserted that there were many cases from which it would appear that this right really existed, although the judgment in each case was put upon other grounds when the plaintiff was granted the relief prayed.. The cases especially referred to were Yovatt *v.* Wingard, 1 J. & W. 394 (1820); Abernethy *v.* Hutchinson, 3 L. J. Ch. 209 (1825); Prince Albert *v.* Strange, 2 De Gex & Sm. 652 (1849); Tuck *v.* Priester, 19 Q. B. D. 639 (1887); Pollard *v.* Phot. Co., 40 Ch. Div. 345 (1888). The first three of these cases related respectively to the publication of recipes, writings, and etchings, which the complainant in each case alleged were either published or about to be published without his consent; and an injunction was granted in the first case upon the ground that the publication of the recipes was the result of a breach of trust and confidence, and in the other two cases upon this ground as well as upon the ground that the complainant had a property right in the writings and etchings. The Tuck and Pollard cases dealt with the publication of pictures, the former being where one was employed to make copies of a picture owned by the plaintiff, and the latter where a photographer was employed to take a photograph of the complainant; the defendant in each instance being about to use the copies in his possession without the consent of the plaintiff. An injunction was granted in the Tuck case on the ground that the sale of the copies would be a breach of contract, and in the Pollard case the decision was rested upon the right of property, although a finding that the publication would be a breach of contract and of trust was authorized. Attention is called to the fact that in Prince Albert's case, while the decision was put upon the ground above stated, Lord Cottenham declared that with respect to the acts of the defendants "privacy is the right invaded." It must be conceded that the numerous cases decided before 1890,

in which equity has interfered to restrain the publication of letters, writings, papers, etc., have all been based either upon the recognition of a right of property or upon the fact that the publication would be a breach of contract, confidence, or trust. It is well settled that if any contract, or property right, or trust relation has been violated, damages are recoverable. There are many cases which sustain such a doctrine.

Cases involving the right of privacy, that have arisen since 1890, will now be considered. In Mackenzie v. Mineral Springs Company (1891), 27 Abb. New Cas. 402, an injunction was granted by the New York Supreme Court, special term, at the instance of a physician, to restrain the publication of an unauthorized recommendation of a medical preparation under his name, upon the grounds that such publication would be injurious to his professional reputation, and "an infringement of his right to the sole use of his own name," and prejudicial to public interest. While this case was not based upon the right of privacy, that right was impliedly recognized. The first reported case in which the right of privacy was expressly recognized was the case of Schuyler v. Curtis (1892), 15 N. Y. Supp. 787, where Justice O'Brien of the Supreme Court of New York granted an injunction to restrain the making and public exhibition of a statue of a deceased person, upon the ground that it was not shown that she was a public character. This judgment was affirmed by the Supreme Court (general term) by Van Brunt and Barrett, JJ., in an opinion by the former in which the rule was laid down that a person, whether a public character or not, has a right to enjoin the making and placing on exhibition of his statue; and he being dead, a relative has this right. 19 N. Y. Supp. 264. When the case came before the Supreme Court (special term), in 1893, the judgment of the general term was followed, and in an opinion by Ingraham, J., the rule was announced that a court of equity, at the instance of one of the relatives of a deceased person, will enjoin the making and placing on public exhibition of a statue of the deceased by unauthorized persons, which the complaining relatives unite in alleging will cause them pain and distress and will be considered by them a disgrace; and this too whether or not the court be of the opinion that the proposed representation should produce the alleged effect; and that such un-

authorized act is not within the provision of the State constitution which secures to each person the right to freely speak, write, and publish his sentiments on all subjects. 24 N. Y. Supp. 509. The statue which it was proposed to exhibit was in no sense a caricature, and the exhibition of the same would not have been a libel upon the deceased. In 1893, in Marks *v.* Jaffa, 26 N. Y. Supp. 908, 6 Misc. 290, an injunction was granted by the superior court of New York City (special term) to restrain the publication of a picture of the plaintiff in the defendant's newspaper, with an invitation to the readers of the paper to vote on the question of the popularity of the plaintiff as compared with another person whose picture was also published in such newspaper. McAdam, J., in the opinion said: "No newspaper or institution, no matter how worthy, has the right to use the name or picture of any one for such a purpose without his consent." The decision was apparently based upon the case of Schuyler *v.* Curtis, above referred to. In 1893 an application was made to Judge Colt, of the United States Circuit Court for the District of Massachusetts, by the widow and children of George H. Corliss, to enjoin the publication and sale of a biographical sketch of Mr. Corliss, and from printing and selling his picture in connection therewith. The bill did not allege that the publication contained any matter which was scandalous, libelous, or false, or that it affected any right of property, but the relief was prayed upon the ground that the publication was an injury to the feelings of the plaintiffs and against their express prohibition. An injunction was refused as to the biography, on the ground that Mr. Corliss was a public man in the same sense as authors or artists are public men; but an injunction was granted as to the publication of the picture, upon the ground that the publisher had obtained a copy of the photograph upon certain conditions, and the publication would be a violation of those conditions. Subsequently a motion was made to dissolve the injunction, on the ground that the photograph from which the copies were made was not obtained in the manner above referred to, but from a copy which was obtained in a lawful way; and the injunction was dissolved upon the ground that neither a public character nor his family after his death has a right to enjoin the publication of his portrait, when the publication would not be a violation of a contract, or a breach of trust

or confidence. Judge Colt in the opinion uses this language: "Independently of the question of contract, I believe the law to be that a private individual has a right to be protected in the representation of his portrait in any form; that this is a property as well as a personal right; and that it belongs to the same class of rights which forbids the reproduction of a private manuscript or painting, or the publication of private letters, or of oral lectures delivered by a teacher to his class, or the revelation of the contents of a merchant's books by a clerk." Corliss v. Walker, 57 Fed. 434, 64 Fed. 280, 31 L. R. A. 283. It is to be noted that the ruling in this case goes no further than that a public character has so waived his right of privacy, if he ever had it, as to authorize the publication of his life and his picture, not only without his consent, but also without the consent of his family after his death, when there is nothing in the biography or the picture which will reflect discredit upon the subject.

In 1894, in Murray v. Lithographic Company, 28 N. Y. Supp. 271, a case decided by the court of common pleas of New York City and County, it was held that a person can not sue to enjoin the publication of a portrait of his infant child, or for damages caused thereby. This decision was undoubtedly correct; for if there was any right to sue for a violation of the right of privacy, the cause of action was in the child and not in the parent. In 1895 the case of Schuyler v. Curtis reached the Court of Appeals of New York, and the judgment of the lower court was reversed. 147 N. Y. 436. It was held that if any right of privacy, in so far as it includes the right to prevent the public from making pictures or statutes commemorative of the worth and services of the subject, exist at all, it does not survive after death and can not be enforced by the relatives of the deceased. The opinion was delivered by Judge Peckham, in the course of which he used this language: "If the defendants had projected such a work in the lifetime of Mrs. Schuyler, it would perhaps have been a violation of her individual right of privacy, because it might be contended that she had never occupied such a position towards the public as would have authorized such action by any one so long as it was in opposition to her wishes." Judge Gray dissented, saying, in his opinion: "I can not see why the right of privacy is not a form of property, as much as is the right of

complete immunity of one's person." This case settles nothing as to the existence of a right of privacy, but merely rules that, if it exists at all, it is a personal right and dies with the person. In Atkinson *v.* Doherty, 121 Mich. 372, 80 N. W. 285, 80 Am. St. Rep. 507, a case decided in 1899, the Supreme Court of Michigan held that the use of the name and likeness of a deceased person as a label for a brand of cigars can not be restrained by injunction, so long as they do not constitute a libel. Many, if not all, the cases above referred to in reference to the right of privacy are mentioned and reviewed in this case. While this decision apparently lays down the broad proposition that the right of privacy does not exist to such an extent as to prohibit one from publishing the picture of another without his consent, in reality the only question necessary to have been decided was whether this right of privacy was personal and died with the person; and therefore the decision on its facts is authoritative no further than the decision of the New York Court of Appeals in Schuyler *v.* Curtis. While the right of privacy is personal, and may die with the person, we do not desire to be understood as assenting to the proposition that the relatives of the deceased can not, in a proper case, protect the memory of their kinsman, not only from defamation, but also from an invasion into the affairs of his private life after his death. This question is not now involved, but we do not wish anything said to be understood as committing us in any way to the doctrine that against the consent of relatives the private affairs of a deceased person may be published and his picture or statue exhibited. We call attention to the ruling in *Jacobus v. Children of Israel*, 107 *Ga.* 518, that damages may be recovered by the relative of a deceased person who is the owner of an easement of burial in a cemetery lot, for the disinterment of the dead body; and that if the injury has been wanton and malicious, or the result of gross negligence and a reckless disregard of the rights of others, exemplary damages may be awarded, in estimating which the injury to the natural feelings of the plaintiff may be taken into consideration. If damages for wounded feelings can be recovered in such a case for the wanton removal of th` bleaching bones of the deceased relative, it would seem for a stronger reason that such damages ought to be allowed to be recovered when those matters which the deceased had jealously guarded from the public during

his lifetime, and his portrait, which was likewise protected from the public gaze, are made public property after his death.

In Roberson *v.* Rochester Folding Box Company (1901), 64 App. Div. 30, decided by the Appellate Division of the Supreme Court of New York, it appeared that lithographic likenesses of a young woman, bearing the words "Flour of the Family," were without her consent printed and used by a flour milling company to advertise its goods. The declaration alleged that in consequence of the circulation of such lithographs the plaintiff's good name had been attacked, and she had been greatly humiliated and made sick and been obliged to employ a physician, and prayed for an injunction against the further use of the lithographs and for damages. It was held that the declaration was not demurrable. It was also held that if a right of property was necessary to entitle the plaintiff to maintain the action, the case might stand upon the right of property which every one has in his own body. This case came before the Court of Appeals of New York in 1902, and the judgment was reversed. 171 N. Y. 540, 64 N. E. 442, 89 Am. St. Rep. 828. This is the first and only decision by a court of last resort involving directly the existence of a right of privacy. The decision was by a divided court; Chief Judge Parker and three of the Associate Judges concurring in a ruling that the complaint set forth no cause of action either at law or in equity; while Judge Gray, with whom concurred two of the Associate Judges, filed a dissenting opinion, in which it was maintained that the injunction should have been granted. While the ruling of the majority is limited in its effect to the unwarranted publication of the picture of another for advertising purposes, the reasoning of Judge Parker goes to the extent of denying the existence in the law of a right of privacy, "founded upon the claim that a man has a right to pass through this world without having his picture published, his business enterprises discussed, or his eccentricities commented upon, whether the comment be favorable or otherwise." The reasoning of the majority is, in substance, that there is no decided case either in England or in this country in which such a right is distinctly recognized; that every case that might be relied on to establish the right was placed expressly upon other grounds, not involving the application of this right in any sense; that the right is not referred to by the com-

mentators and writers upon the common law or the principles of equity; that the existence of the right is not to be legitimately inferred from anything that is said by any of such writers; and that a recognition of the existence of the right would·bring about a vast amount of litigation; and that in many instances where the right would be asserted it would be difficult, if not impossible, to determine the line of demarkation between the plaintiff's right of privacy and the well-established rights of others and of the public. For these reasons the conclusion is reached that the right does not exist, has never existed, and can not be enforced as a legal right. We have no fault to find with what is said by the distinguished and learned judge who voiced the views of the majority, as to the existence of decided cases, and agree with him in his analysis of the various cases which he reviews, that the judgment.in each was based upon other grounds than the existence of a right of privacy. We also agree with him so far as he asserts that the writers upon the common law and the principles of equity do not in express terms refer to this right.    But we are utterly at vari-ance with him in his conclusion that the existence of this right can not be legitimately inferred from what has been said by com-mentators upon the legal rights of individuals, and from expres-sions which have fallen from judges in their reasoning in cases where the exercise of the right was not directly involved. So far as the judgment in the case is based upon the argument ab incon-venienti, all that is necessary to be said is that this argument has no place in the case if the right invoked has an existence in the law. But if it were proper to use this argument at all, it could be said with great force that as to certain matters the individual feels and knows that he has a right to exercise the liberty of privacy, and that he has a right to resent any invasion of this liberty; and if the law will not protect him against invasion, the individual will, to protect himself and those to whom he owes protection, use those weapons with which nature has provided him as well as those which the ingenuity of man has placed within his reach. Thus the peace and good order of society would be disturbed by each individual becoming a law unto himself to determine when and under what circumstances he should avenge the outrage which has been perpetrated upon him or a member of his family.    The true lawyer, when called to the discharge of judicial functions, has

in all times, as a general rule, displayed remarkable conservatism; and wherever it was legally possible to base a judgment upon principles which had been recognized by a long course of judicial decision, this has been done, in preference to applying a principle which might be considered novel.　It was for this reason that the numerous cases, both in England and in this country, which really protected the right of privacy were not placed upon the existence of this right, but were allowed to rest upon principles derived from the law of property, trust, and contract.　Any candid mind will, however, be compelled to concede that in order to give relief in many of those cases it required a severe strain to bring them within the recognized rules which were sought to be applied.　The desire to avoid the novelty of recognizing a principle which had not been theretofore recognized was avoided in such cases by the novelty of straining a well-recognized principle to cover a state of facts to which it had never before been applied.　This conservatism of the judiciary has sometimes unconsciously led judges to the conclusion that because the case was novel the right claimed did not exist.　With all due respect to Chief Judge Parker and his associates who concurred with him, we think the conclusion reached by them was the result of an unconscious yielding to the feeling of conservatism which naturally arises in the mind of a judge who faces a proposition which is novel.　The valuable influence upon society and upon the welfare of the public of the conservatism of the lawyer, whether at the bar or upon the bench, can not be overestimated; but this conservatism should not go to the extent of refusing to recognize a right which the instincts of nature prove to exist, and which nothing in judicial decision, legal history, or writings upon the law can be called to demonstrate its non-existence as a legal right.

We think that what should have been a proper judgment in the Roberson case was that contended for by Judge Gray in his dissenting opinion, from which we quote as follows: The right of privacy, or the right of the individual to be let alone, is a personal right, which is not without judicial recognition.　It is the complement of the right to the immunity of one's person.　The individual has always been entitled to be protected in the exclusive use and enjoyment of that which is his own.　The common law regarded his person and property as inviolate, and he has the

absolute right to be let alone.   Cooley, Torts, p. 29.   The princi-
ple is fundamental, and essential in organized society, that every
one, in exercising a personal right and in the use of his property,
shall respect the rights and properties of others.   He must so con-
duct himself, in the enjoyment of the rights and privileges which
belong to him as a member of society, as that he shall prejudice
no one in the possession and enjoyment of those which are exclu-
sively his.     When, as here, there is an alleged invasion of some
personal right, or privilege, the absence of exact precedent and the
fact that early commentators upon the common law have no dis-
cussion upon the subject are of no material importance in award-
ing equitable relief.   That the exercise of the preventive power of
a court of equity is demanded in a novel case is not a fatal objec-
tion. . . As I have suggested, that the exercise of this peculiar pre-
ventive power of a court of equity is not found in some precisely
analogous case furnishes no valid objection at all to the assump-
tion of jurisdiction, if the particular circumstances of the case
show the performance, or the threatened performance, of an act by
a defendant, which is wrongful, because constituting an invasion,
in some novel form, of a right to something which is, or should
be conceded to be, the plaintiff's, and as to which the law provides
no adequate remedy.   It would be a justifiable exercise of power,
whether the principle of interference be rested upon analogy to
some established common-law principle, or whether it is one of
natural justice. . . Instantaneous photography is a modern inven-
tion, and affords the means of securing a portraiture of an individ-
ual's face and form, in invitum their owner.   While, so far. forth as
it merely does that, although a species of aggression, I concede it to
be an irremediable and irrepressible feature of the social evolution.
But if it is to be permitted that the portraiture may be put to
commercial, or other, uses for gain, by the publication of prints
therefrom, then an act of invasion of the individual's privacy re-
sults, possibly more formidable and more painful in its conse-
quences than an actual bodily assault might be.//Security of per-
son is as necessary as the security of property ; and for that com-
plete personal security, which will result in the peaceful and
wholesome enjoyment of one's privileges as a member of society,
there should be afforded protection, not only against the scanda-
lous portraiture and display of one's features and person, but

against the display and use thereof for another's commercial purposes or gain. The proposition is to me an inconceivable one that these defendants may unauthorizedly use the likeness of this young woman upon their advertisement, as a method of attracting widespread public attention to their wares, and that she must submit to the mortifying notoriety, without right to invoke the exercise of the preventive power of a court of equity. Such a view, as it seems to me, must have been unduly influenced by a failure to find precedents in analogous cases, or some declaration, by the great commentators upon the law, of a common-law principle which would precisely apply to and govern the action; without taking into consideration that, in the existing state of society, new conditions affecting the relations of persons demand the broader extension of those legal principles, which underlie the immunity of one's person from attack. I think that such a view is unduly restricted, too, by a search for some property which has been invaded by the defendant's acts. Property is not, necessarily, the thing itself which is owned; it is the right of the owner in relation to it. The right to be protected in one's possession of a thing, or in one's privileges, belonging to him as an individual, or secured to him as a member of the commonwealth, is property, and as such entitled to the protection of the law. The protective power of equity is not exercised upon the tangible thing, but upon the right to enjoy it; and so it is called forth for the protection of the right to that which is one's exclusive possession, as a property right. It seems to me that the principle which is applicable is analogous to that upon which courts of equity have interfered to protect the right of privacy, in cases of private writings, or of other unpublished products of the mind. . . .

" I think that this plaintiff has the same property in the right to be protected against the use of her face for defendants' commercial purposes as she would have if they were publishing her literary compositions. The right would be conceded, if she had sat for her photograph; but if her face or her portraiture has a value, the value is hers exclusively until the use be granted away to the public. Any other principle of decision, in my opinion, is as repugnant to equity as it is shocking to reason. . . The right to grant the injunction does not depend upon the existence of property which one has in some contractual form. It depends

upon the existence of property in any right which belongs to a person. ... It would be, in my opinion, an extraordinary view which, while conceding the right of a person to be protected against the unauthorized circulation of an unpublished lecture, letter, drawing, or other ideal property, yet would deny the same protection to a person whose portrait was unauthorizedly obtained and made use of for commercial purposes. The injury to the plaintiff is irreparable; because she can not be wholly compensated in damages for the various consequences entailed by the defendants' acts. The only complete relief is an injunction restraining their continuance. Whether, as incidental to that equitable relief, she should be able to recover only nominal damages is not material; for the issuance of the injunction does not, in such a case, depend upon the amount of the damages in dollars and cents."

The effect of the reasoning of the learned judge whose words have just been quoted is to establish conclusively the correctness of the conclusion which we have reached, and we prefer to adopt as our own his reasoning in his own words rather than to paraphrase them into our own. The decision of the Court of Appeals of New York in the Roberson case gave rise to numerous articles in the different law magazines of high standing in the country, some by the editors and others by contributors. In some the conclusion of the majority of the court was approved; in others the views of the dissenting judges were commended; and in still others the case and similar cases were referred to as apparently establishing that the claim of the majority was correct, but regret was expressed that the necessity was such that the courts could not recognize the right asserted. An editorial in the American Law Review (vol. 36, p. 636) said: "The decision under review shocks and wounds the ordinary sense of justice of mankind. We have heard it alluded to only in terms of regret." There were also articles referring to other cases cited which deal with the question as to the existence of a right of privacy. See 36 Am. Law Rev. 614, 634; 34 Am. Law Reg. (N. S.) 134; 41 Id. 669; 1 Col. Law Rev. 491; 2 Id. 437; 44 Alb. Law J. 428; 55 Cent. L. J. 123; 57 Id 361. See also North American Review (September, 1902), 361.; 22 Am. & Eng. Enc. Law (2d ed.) 1311; note to Roberson v. Box Co., 89 Am. St. Rep. 844; note to Corliss v. Walker, 31 L. R. A. 283.

Articles on the subject of the right of privacy have also appeared in 12 Yale L. J. 35, 24 Nat. Corp. Rep. 709, 25 Id. 183, 415, 6 Law Notes, 79, 36 Chicago L. N. 126, and Case & Comment. (July 1902); but these articles were not accessible to us at the time this opinion was written.

| As we have already said, cases may arise where it is difficult to determine on which side of the line of demarkation which separates the right of privacy from the well-established rights of others they are to be found; but we have little difficulty in arriving at the conclusion that the present case is one in which it has been established that the right of privacy has been invaded, and invaded by one who can not claim exemption under the constitutional guaranties of freedom of speech and of the press. [ The form and features of the plaintiff are his own. The defendant insurance company and its agent had no more authority to display them in public for the purpose of advertising the business in which they were engaged than they would have had to compel the plaintiff to place himself upon exhibition for this purpose. The latter procedure would have been unauthorized and unjustifiable, as every one will admit; and the former was equally an invasion of the rights of his person. Nothing appears from which it is to be inferred that the plaintiff has waived his right to determine for himself where his picture should be displayed in favor of the advertising right of the defendants. The mere fact that he is an artist does not of itself establish a waiver of this right, so that his picture might be used for advertising purposes. If he displayed in public his works as an artist, he would of course subject his works and his character as an artist, and possibly his character and conduct as a man, to such scrutiny and criticism as would be legitimate and proper to determine whether he was entitled to rank as an artist and should be accorded recognition as such by the public. But it is by no means clear that even this would have authorized the publication of his picture. The constitutional right to speak and print does not necessarily carry with it the right to reproduce the form and features of an individual. The plaintiff was in no sense a public character, even if a different rule in regard to the publication of one's picture should be applied to such characters. It is not necessary in this case to hold, nor are we prepared to do so, that the mere fact that a man

has become what is called a public character, either by aspiring to public office, or by holding public office, or by exercising a profession which places him before the public, or by engaging in a business which has necessarily a public nature, gives to every one the right to print and circulate his picture. To use the language of Hooker, J., in Atkinson *v.* Doherty, supra, "We are loath to believe that the man who makes himself useful to mankind surrenders any right to privacy thereby, or that because he permits his picture to be published by one person, and for one purpose, he is forever thereafter precluded from enjoying any of his rights." It may be that the aspirant for public office, or one in official position, impliedly consents that the public may gaze not only upon him but upon his picture; but we are not prepared now to hold that even this is true. It would seem to us that even the President of the United States in the lofty position which he occupies has some rights in reference to matters of this kind, which he does not forfeit by aspiring to or accepting the highest office within the gift of the people of the several States. While no person who has ever held this position, and probably no person who has ever held public office, has ever objected, or ever will object, to the reproduction of his picture in reputable newspapers, magazines, and periodicals, still it can not be that the mere fact that a man aspires to public office or holds public office subjects him to the humiliation and mortification of having his picture displayed in places where he would never go to be gazed upon, at times when and under circumstances where, if he were personally present, the sensibilities of his nature would be severely shocked. If one's picture may be used by another for advertising purposes, it may be reproduced and exhibited anywhere. If it may be used in a newspaper, it may be used on a poster or a placard. It may be posted upon the walls of private dwellings or upon the streets. It may ornament the bar of the saloon-keeper, or decorate the walls of a brothel. By becoming a member of society, neither man nor woman can be presumed to have consented to such uses of the impression of their faces and features upon paper or upon canvas. The conclusion reached by us seems to be so thoroughly in accord with natural justice, with the principles of the law of every civilized nation, and especially with the elastic principles of the common law, and so thoroughly in

harmony with those principles as molded under the influence of American institutions, that it seems strange to us that not only four of the judges of one of the most distinguished and learned courts of the Union, but also lawyers of learning and ability, have found an insurmountable stumbling-block in the path that leads to a recognition of the right which would give to persons like the plaintiff in this case, and the young woman in the Roberson case, redress for the legal wrong, or, what is by some of the law-writers called, the outrage, perpetrated by the unauthorized use of their pictures for advertising purposes.

What we have ruled can not be in any sense construed as an abridgment of the liberty of speech and of the press as guaranteed in the constitution.    Whether the reproduction of a likeness of another which is free from caricature can in any sense be declared to be an exercise of the right to publish one's sentiments, certain it is that one who, merely for advertising purposes and from mercenary motives, publishes the likeness of another without his consent, can not be said, in so doing, to have exercised the right to publish his sentiments.    The publication of a good likeness of another, accompanying a libelous article, would give a right of action.    The publication of a caricature is generally, if not always, a libel.    Whether the right to print a good likeness of another is an incident to a right to express one's sentiments in reference to a subject with which the person whose likeness is published is connected, is a question upon which we can not, under the present record, make any authoritative decision ; but it would seem that a holding that the publication of a likeness under such circumstances, without the consent of the person whose likeness is published, is allowable, would be giving to the word *sentiments* a very extended meaning.    The use of a pen portrait might be allowable in some cases where the use of an actual portrait was not permissible.    There is in the publication of one's picture for advertising purposes not the slightest semblance of an expression of an idea, a thought, or an opinion, within the meaning of the constitutional provision which guarantees to a person the right to publish his sentiments on any subject.    Such conduct is not embraced within the liberty to print, but is a serious invasion of one's right of privacy, and may in many cases, according to the circumstances of the publication and the uses to which it is put, cause damages

to flow which are irreparable in their nature. The knowledge that one's features and form are being used for such a purpose and displayed in such places as such advertisements are often liable to be found brings not only the person of an extremely sensitive nature, but even the individual of ordinary sensibility, to a realization that his liberty has been taken away from him, and, as long as the advertiser uses him for these purposes, he can not be otherwise than conscious of the fact that he is, for the time being, under the control of another, that he is no longer free, and that he is in reality a slave without hope of freedom, held to service by a merciless master; and if a man of true instincts, or even of ordinary sensibilities, no one can be more conscious of his complete enthrallment than he is.

So thoroughly satisfied are we that the law recognizes within proper limits, as a legal right, the right of privacy, and that the publication of one's picture without his consent by another as an advertisement, for the mere purpose of increasing the profits and gains of the advertiser, is an invasion of this right, that we venture to predict that the day will come when the American bar will marvel that a contrary view was ever entertained by judges of eminence and ability, just as in the present day we stand amazed that Lord Coke should have combated, with all the force of his vigorous nature, the proposition that the court of chancery had jurisdiction to entertain an application for injunction to restrain the enforcement of a common-law judgment which had been obtained by fraud; and that Lord Hale, with perfect composure of manner and complete satisfaction of soul, imposed the death penalty for witchcraft upon ignorant and harmless women.

13–15. It is now to be determined whether what may be called the first count in the petition set forth a cause of action for libel, as against a general demurrer. The publication did not mention the plaintiff's name, but it did contain a likeness of him that his friends and acquaintances would readily recognize as his, and the words of the publication printed under the likeness were put into the mouth of him whose likeness was published. It was, so far as his friends and acquaintances were concerned, the same as if his name had been signed to the printed words. In these words he was made to say, in effect, that he had secured insurance with the defendant company, that on this account his family were protected,

and he was receiving an income from an annual dividend on paid-up policies.    These words are harmless in themselves.    Standing alone, they contain nothing and carry no inference of anything that is disgraceful, to be ashamed of, or calculated to bring one into reproach.    When in an action for libel the words declared on are harmless in themselves, and the petition alleges no extrinsic facts which would show that the words might be taken in other than their ordinary sense, a cause of action for a libel is not sufficiently set forth.    Stewart v. Wilson, 23 Minn. 449.    If in the light of extrinsic facts words apparently harmless are such as to convey to the mind of the reader who is acquainted with the extrinsic facts a meaning which will be calculated to expose the person about whom the words are used to contempt or ridicule, then such harmless words become libelous, and an action is well brought although no special damages may be alleged.    Behre v. Cash Register Co., 100 Ga. 213 ; Holmes v. Clisby, 118 Ga. 823 ; Central Railway Co. v. Sheftall, 118 Ga. 865.    It is alleged that the plaintiff did not have, and never had, a policy of insurance with the defendant company ; and that this fact was known to his friends and acquaintances.    In the light of these allegations, the words attributed to the plaintiff become absolutely false, and those who are acquainted with the facts, upon reading the statement, would naturally ask, for what purpose was this falsehood written ? It was either gratuitous or it was for a consideration ; and which-ever conclusion might be reached, the person to whom the words were attributed would become contemptible in the mind of the reader.    He would become at once a self-confessed liar.    If he lied gratuitously, he would receive and merit the contempt of all per-sons having a correct conception of moral principles.    If he lied for a consideration, he would become odious to every decent individual.    See Colvard v. Black, 110 Ga. 643.    It seems clear to us that a jury could find from the facts alleged that the publica-tion, in the light of the extrinsic facts, was libelous; and the plaintiff was entitled to have this question submitted to the jury. Beazley v. Reid, 68 Ga. 380 ; Holmes v. Clisby, 121 Ga. 241.

16. Having reached the conclusion that each count in the peti-tion set forth a cause of action as against a general demurrer, it remains now to be determined whether any of the objections raised in the special demurrer were well taken.    It is said that there

was a misjoinder of parties, in that Adams should not be joined with the other defendants, or either of them, in the count for libel, or the count for a violation of the right of privacy.  The allegations of the petition are sufficient to show that the three defendants were joint wrong-doers, and were therefore not improperly joined in the same action.  A further objection was that there was a misjoinder of causes of action, in that there was an attempt to join a cause of action ex delicto (the libel) with a cause of action ex contractu (the violation of the right of privacy).  While the petition does allege that the violation of the right of privacy was the result of a breach of trust or confidence reposed in Adams, still it is distinctly charged that it is a trespass upon his right of privacy ; and construing the petition as a whole, it is manifest that the pleader intended to bring an action for a tort.  It was further objected that no facts were alleged from which the charge of malice can be legally drawn, and that it did not appear from the allegations of the petition that any ridicule befell petitioner by reason of the publication.  The publication, in the light of the extrinsic facts, being a libel, the law would infer malice, and it was not necessary to allege that any ridicule actually befell the petitioner; all that is necessary to constitute the publication a libel being that the statements should be of such a character as have a tendency to bring the plaintiff into contempt or ridicule.  The court erred in dismissing the petition.

*Judgment reversed.   All the Justices concur.*