JAMES N. HENRY *vs.* CHERRY & WEBB.

JUNE 22, 1909.

PRESENT:   Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1)   *Right of Privacy.*

Declaration in trespass *vi et armis* alleged that defendants, dealers in dry goods etc., invaded plaintiff's right of privacy, in that they published, in connection with their advertisements, in a public newspaper, a picture of

plaintiff seated in an automobile, in connection with certain words relating to price and the quality of the garments worn by those represented in the picture, subjecting plaintiff to ridicule, and causing mental suffering:—

*Held,* that, if the right of privacy exists and has been recognized, it must be as a personal tort right. It can not be a right of property. The gravamen of the offence in a violation of the right of privacy is the interference with the seclusion of the individual, and not the publication.

If the publication were an ingredient, the proper count would be trespass on the case for an indirect injury to the person, as in libel.

*Held,* further, that a person has no right of privacy for the invasion of which an action for damages lies at common law.

*Held,* further, that there is no room in our constitutional theory for any transcendent right or instinct of nature, except as guaranteed by the constitution.

The function of adjusting remedies to rights is a legislative rather than judicial one, and up to the present time the legislature of this State has omitted to provide a remedy for an invasion of the right of privacy.

The court has always held that it is not at liberty to construe into the constitution new principles which did not exist at the time of its adoption; and when the form of words used in the constitution is borrowed from an older source, it comes laden with its previous meaning.

The clauses in the fourteenth amendment to the constitution of the United States, and in the constitution of Rhode Island, Art. 1, § 10, relative to depriving a person of "liberty" etc., were borrowed from the 39th article of Magna Charta.

"Liberty," in the sense used in the constitutions, is not confined to mere freedom from incarceration, but includes the rights to go where one pleases and to earn one's livelihood in a lawful calling; but the exhibition of a picture does not restrain a person's movements, curtail his choice of occupation, nor abridge his freedom of contract.

TRESPASS *vi et armis.* Certified from Superior Court on demurrer to declaration.

DUBOIS, C. J. This is an action of trespass *vi et armis,* brought by the plaintiff in the Superior Court. The material portion of the plaintiff's declaration, in two counts, reads as follows:

"*FIRST COUNT.* For that at the time of the committing of the grievances hereinafter complained of the defendants were engaged in a general mercantile business of buying and selling dry-goods, ladies' garments, etc., in said City of Providence, and extensively advertised their wares and merchandise in the public newspapers published in said Providence; that on the 10th day of April, A. D. 1908, the defendants, with force and arms, invaded the plaintiff's right of privacy in this, to wit, that they published in connection with their aforesaid advertisements a likeness or picture of the plaintiff in the issue of the

Providence Evening Bulletin of that date, which said paper is one of the public newspapers in said Providence and has a large and extensive circulation throughout said city and state. That said picture or likeness of the plaintiff was easily recognized by his friends and acquaintances; that the plaintiff was pictured as seated in an automobile, apparently driving the same, and also in said picture were several other persons, represented as sitting in the rear seat of said automobile; that the said picture or likeness appeared in a prominent place in said newspaper and was likely to and did attract much attention. Below the picture, in heavy black type, were the words ' ONLY 10.50 '— and below on the next line, in heavy display type, were the words — 'THE AUTO COATS WORN BY ABOVE AUTOISTS ARE WATER–PROOF. MADE OF FINE QUALITY SILK MOHAIR—10.50—IN FOUR COLORS.' And the plaintiff avers that he is not a public character and has in no way waived his right of privacy, and that the defendants then and there, to wit, on said 10th day of April, A. D. 1908, without the knowledge and consent of the plaintiff and knowing that they had no authority so to do caused said likeness or picture of the plaintiff to be published in said Evening Bulletin, which said publication tended to and did make the plaintiff the object of much scoff, ridicule and public comment, contrary to the plaintiff's right of privacy in the premises so far as the acts of the defendants were concerned. And the plaintiff avers that the said publication was a trespass upon his said right of privacy, and as a result of said invasion of his right of privacy by the defendants as aforesaid he has been made the object of much ridicule, scoff and gibes by those of his friends and acquaintances who have recognized his likeness in said publication, and has suffered great mental anguish, all of which the defendants did against the peace and to the damage of the plaintiff, as he says, One Thousand dollars, as laid in his writ dated the 21st day of April, A. D. 1908.

"*SECOND COUNT.* For that, at said Providence, on the 10th day of April, A. D. 1908, the defendants then and there published in the Evening Bulletin, a public newspaper printed in said Providence and having a large circulation throughout

said city and state, a picture or likeness of the plaintiff that would be and was recognized by the friends and acquaintances of the plaintiff; that in such picture the plaintiff was represented as apparently driving an automobile, in which were seated several other persons; that beneath said picture, in heavy black type, were the words — 'ONLY 10.50' — and below on the next line, in heavy display type, were the words:— 'THE AUTO COATS WORN BY ABOVE AUTOISTS ARE WATER-PROOF. MADE OF FINE QUALITY SILK MO-HAIR—10.50—IN FOUR COLORS.' That said picture was 'featured' in a prominent place in said newspaper and tended to and did attract much attention. That said picture or likeness of the plaintiff, taken in connection with the words inserted beneath it (which said words are above referred to in this count), tended to and did expose the plaintiff to unwarranted humiliation and to the scoff, jeers and gibes of his friends and acquaintances who recognized the said likeness or picture of the plaintiff. And the plaintiff avers that said publication of his said likeness or picture and of the words of the advertisement in connection therewith, hereinbefore referred to, was without his knowledge or consent, and was wholly unwarranted on the part of said defendants, and that by reason of said unwarranted publication of his said likeness or picture as aforesaid he has been subjected to great humiliation and held up to public ridicule and has suffered mental anguish therefrom.

"To the damage of the plaintiff, as he says, $1,000.00, as laid in his writ dated the 21st day of April, A. D. 1908."

To this declaration the defendants demurred, upon the following grounds:

"*First.* The form of action should be trespass on the case and not trespass, as declared upon,"—and to the first count for the reasons following:

"*First.* Said count sets forth no cause of action.

"*Second.* Said count alleges no right for the invasion of which the plaintiff is entitled to recover damages against the defendants.

"*Third.* The law does not regard the right of privacy as a right for the invasion of which a person is entitled to recover

damages,"—and to the second count for the following causes:

"*First.* Said count is indefinite and uncertain in its statement of the cause of action, and it is impossible therefrom to determine whether the plaintiff relies upon an action for alleged libel, or for an alleged invasion of his right of privacy.

"*Second.* Said count states no cause of action against the defendants.

"*Third.* If the plaintiff relies upon an action for libel, the alleged publication is not defamatory.

"*Fourth.* If the plaintiff relies upon an action for libel, the alleged publication is not libelous *per se* and said count contains no averment of special damages.

"*Fifth.* Said count alleges no right for the invasion of which by the defendants the plaintiff is entitled to recover damages against the defendants,"—whereupon a justice of the Superior Court entered the following order of certification:

"This cause being before the court for hearing upon the defendant's demurrer to the plaintiff's declaration, and thereupon certain questions of law arising which, in the opinion of the court, are of such doubt and importance and so affect the merits of the controversy that they ought to be determined by the Supreme Court before further proceedings, it is ordered that the following questions be certified to the Supreme Court under the provisions of section 478 of Court and Practice Act, namely:

"*First.* Has a person at common law a right designated as a right of privacy, for the invasion of which an action for damages lies?

"*Second.* Is the unwarranted publication of a person's photograph for advertising purposes actionable at common law where the only injury alleged is that of mental suffering?"

The provisions of C. P. A. § 478, under which the questions have been certified for our determination, are as follows:

"Sec. 478. If in any proceeding, civil or criminal, in the superior court or in any district court, prior to the trial thereof on its merits, any question of law shall arise which in the opinion of the court is of such doubt and importance, and so affects the merits of the controversy that it ought to be deter-

mined by the supreme court before further proceedings, or if a motion in arrest of judgment be made, the court in which the cause is pending may certify such question or motion to the supreme court for that purpose and stay all further proceedings until the question is heard and determined."

Treating the first question literally, it might easily be answered in the negative; for we are unable to find any opinion, decision, or dictum which determines that such a right was so designated at common law; but we are unwilling to dismiss so important and interesting a question upon such a technical ground. We prefer to treat both of the questions as broadly as possible, within the limits of the case in which they have arisen. Perhaps the questions may as well be considered as if they read: Has a person a right of privacy, for the invasion of which an action for damages lies at common law? Is the unwarranted publication of a person's photograph for advertising purposes an invasion of such right? and, can an action for such an invasion be maintained at common law where the only injury alleged is that of mental suffering?

It is apparent that if the first question should be answered in the negative no necessity would exist for answering the others; and that if the first should be answered affirmatively and the second in the negative, it would then become unnecessary to answer the third. The consideration of the case may be simplified by eliminating the second count of the declaration, which, as claimed by the plaintiff, charges the defendants with libel. "A libel is a malicious defamation expressed in printing or writing, or by signs, pictures, &c., tending to injure the reputation of another, and thereby exposing such person to public hatred, contempt, or ridicule. And an action on the case is maintainable against any person who falsely and maliciously publishes any libel against another." 2 Selwyns Nisi Prius, 7th Am. ed. *1045. It is perfectly clear, upon inspecting the second count, that nothing therein contained charges the defendants with malice or with the publication of anything defamatory, scandalous, or otherwise than the exact truth. Such a count can not be regarded as charging libel against the defendants; and as they have demurred to the same, as afore-

said, and as the same is clearly bad on demurrer, it may be disregarded in the further consideration of the case.

It must be conceded at the outset that the common law recognizes sundry personal rights and privileges, and gives a right of action for interference with the same, and that some of these rights so recognized include immunity from intrusion. But, as we understand the question, the right of privacy therein alluded to contemplates a simple right, uncomplicated with and uninfluenced by other rights; as, for example, the right to liberty, property, or reputation.

The theory that every one has a right to privacy; that the same is a personal right, growing out of the inviolability of the person, defined by Judge Cooley in his work on Torts, 2d ed. p. 29, as: "Personal Immunity. The right to one's person may be said to be a right of complete immunity: to be let alone;" and that a person is entitled to relief at law or in equity for an invasion of the same, is generally understood to have been first publicly advanced in an article entitled, "The Right to Privacy," published in 4 Harv. L. Rev. 193 (December, 1890), wherein some of the necessities for invoking such relief are set out, as follows:

"Recent inventions and business methods call attention to the next step which must be taken for the protection of the person, and for securing to the individual what Judge Cooley calls the right 'to be let alone.' Instantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life: and numerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.' For years there has been a feeling that the law must afford some remedy for the unauthorized circulation of portraits of private persons; and the evil of the invasion of privacy by the newspapers, long keenly felt, has been but recently discussed by an able writer. The alleged facts of a somewhat notorious case brought before an inferior tribunal in New York a few months ago, directly involved the consideration of the right of circulating portraits; and the question whether our law will recognize and protect the

right to privacy in this and in other respects must soon come before our courts for consideration.

"Of the desirability—indeed of the necessity—of some such protection, there can, it is believed, be no doubt. The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. To satisfy a prurient taste, the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by intrusion upon the domestic circle. The intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury. Nor is the harm wrought by such invasions confined to the suffering of those who may be made the subjects of journalistic or other enterprise. In this, as in other branches of commerce, the supply creates the demand."

From time to time since the publication of this article the theory has been presented in cases before various tribunals, but it has never been approved or adopted by any court of last resort before the year 1905, when, in the case of *Pavesich* v. *N. E. Mut. L. Ins. Co.* 122 Ga. 190, 2 Eng. & Am. Ann. Cas. 561, it was held that the invasion of a person's right of privacy is actionable, regardless of special damage to person, property, or character. Such right of privacy was defined by Mr. Justice Cobb, speaking for the court, as the right, if one so desires, "to live a life of seclusion," and by way of illustration he remarks that the right would prevent the publication of "those matters and transactions of private life which are wholly foreign, and can throw no light whatever" on the competency for office of any public man.

In *Roberson* v. *Rochester Folding Box Co.*, 171 N. Y. 538 (1902), Chief Judge Parker describes it as the right that a man has "to pass through this world, if he wills, without having his picture published, his business enterprises discussed, his successful experiments written up for the benefit of others, or his eccentricities commented upon either in hand bills, circulars, catalogues, periodicals, or newspapers; and, necessarily, that the things which may not be written and published of him must not be spoken of him by his neighbors, whether the comment be favorable or otherwise."

Judge Gray, in his dissenting opinion in *Schuyler* v. *Curtis*, 147 N. Y. 434 (1895), held that the erection of a statue of a deceased relative violated the right.

The right of privacy is said to be the "right to be let alone." As is pointed out by Cobb, J., in *Pavesich* v. *N. E. Mut. L. Ins. Co.*, *supra*, the Roman law recognized a right of privacy when it made it actionable to speak to one without permission, or to follow him on the street. It is asserted that a man has a right to withdraw from the world, to leave a blank as if he never had been, and other human beings are forbidden to recognize his existence or speak of his memory. In the case of *Schuyler* v. *Curtis*, 27 Abb. N. C. 387, and in the appellate division of the same court, 64 Hun. 594, the right of privacy was recognized as prohibiting the erection of a statue of a deceased relative, on the theory that the flaunting of the memory of the plaintiff's deceased relative before the world invaded the plaintiff's right to be let alone. This case was reversed in the Court of Appeals, 147 N. Y. 434, but the court was of the opinion that if the right of privacy existed, in a proper case it would prohibit talk of one's deceased relatives, or a statue of them, and presumably a picture published in the newspaper, as effectually as if the suit was brought by the person whose picture was published.

These definitions show that the right of privacy contended for would embrace all forms of interference with the mental well-being of an individual, whether by publishing his picture, by gossip, or by pointing him out as possessed of peculiar qualities. The gravamen of the offense would consist in the

interference . with his right of seclusion, irrespective of the intent of the intermeddler.

Mr. Justice Gray, in his dissenting opinion in *Schuyler* v. *Curtis, supra,* regards the right of privacy as a "form of property," and bases his claim that equity should interfere by an injunction solely on that ground, quoting *Prince Albert* v. *Strange,* 2 De Gex & S. 652; *Gee* v. *Pritchard,* 2 Swanst. 402, and other English cases, all of them basing the interference of equity on a violation of complainant's property rights. After citing the above decisions, the judge proceeds: "These decisions are authority for the doctrine that equity will interfere to prevent what are deemed to be violations of personal legal rights, and the only limitation upon the application is that the legal right which is to be protected shall be one cognizable as property." A careful reading of the opinion leads to the conclusion that it was because the judge regarded this right as one of property that equity could furnish relief when it was prohibited from so doing in cases of libel and injury to the reputation generally. In the dissenting opinion of the same justice in *Roberson* v. *Rochester Folding Box Co., supra,* a dissent concurred in by two other justices, he writes: "I think that this plaintiff has the same property in the right to be protected against the use of her face for the defendant's commercial purposes as she would have if they were publishing her literary compositions." In this opinion, also, the right of equity to interfere is based purely on the right of property. No reason save the above analogy is given in the opinion for considering the right of privacy as a property right.

In our opinion, the analogy is not a sound one. Property in the productions of one's mind, in conformity with all other property rights, is capable of passing by descent to one's heirs or representatives, and can be protected by them because of ownership of property. Thus in *Duke of Queensbury* v. *Shebbeare,* 2 Eden, 329, an injunction issued, at the instance of the representatives of Lord Clarendon, to restrain the defendant from publishing copies of Lord Clarendon's history, though defendant had the manuscript from a person to whom it had been given by the Earl of Clarendon.

It has been decided, however, that the right of privacy dies with the person.    Justice Peckham writes as follows in *Schuyler* v. *Curtis, supra:* "Whatever the rights of the relative may be, they are not, in such a case as this, rights which once belonged to the deceased, and which a relative can enforce in her behalf and in a mere representative capacity; as, for instance, an executor or administrator, in regard to the assets of a deceased. . . . Whatever right of privacy Mrs. Schuyler had, died with her."

In the case of *Pavesich* v. *N. E. Mut. L. Ins. Co., supra,* Mr. Justice Cobb, having made the concession that prior to 1890 every adjudicated case, both in this country and in England, which might be said to have involved a right of privacy, was not based upon the existence of such right, but was founded upon a supposed right of property, or a breach of trust or confidence, or the like; and that therefore a claim to a right of privacy, independent of a property or contractual right or some right of a similar nature, had, up to that time, never been recognized in terms in any decision; that the entire absence for a long period of time, even for centuries, of a precedent for an asserted right should have the effect to cause the courts to proceed with caution before recognizing the right, for fear that they may thereby invade the province of the law-making power, argues as follows: "but such absence, even for all time, is not conclusive of the question as to the existence of the right.    The novelty of the complaint is no objection when an injury cognizable by law is shown to have been inflicted on the plaintiff.    In such a case, 'although there be no precedent, the common law will judge according to the law of nature and the public good.'    Where the case is new in principle, the courts have no authority to give a remedy, no matter how great the grievance; but where the case is only new in instance, and the sole question is upon the application of a recognized principle to a new case, 'it will be just as competent to courts of justice to apply the principle to any case that may arise two centuries hence as it was two centuries ago.'    Brooms Leg. Max. (8th ed.) 193.    This results from the application of the maxim *ubi jus ibi remedium* which finds expression in our code,

where it is declared that 'for every right there shall be a remedy, and every court having jurisdiction of the one may, if necessary,' frame the other.' Civil Code, §4929. The individual surrenders to society many rights and privileges which he would be free to exercise in a state of nature, in exchange for the benefits which he receives as a member of society. But he is not presumed to surrender all those rights, and the public has no more right, without his consent, to invade the domain of those rights which it is necessarily to be presumed he has reserved than he has to violate the valid regulations of the organized government under which he lives. The right of privacy has its foundation in the instincts of nature. It is recognized intuitively, consciousness being the witness that can be called to establish its existence. Any person whose intellect is in a normal condition recognizes at once that as to each individual member of society there are matters private and there are matters public so far as the individual is concerned. Each individual as instinctively resents any encroachment by the public upon his rights which are of a private nature as he does the withdrawal of those of his rights which are of a public nature. A right of privacy in matters purely private is therefore derived from natural law. This idea is embraced in the Roman's conception of justice, which 'was not simply the external legality of acts, but the accord of external acts with the precepts of the law prompted by internal impulse and free volition.' McKeldey's Roman Law (Dropsie), §123. It may be said to arise out of those laws sometimes characterized as *immutable,* ' because they are natural, and so just at all times, and in all places, that no authority can either change or abolish them.' I Domat's Civil Law, by Strahan (Cushing's ed.), 49. It is one of those rights referred to by some law-writers as *absolute;* 'such as would belong to their persons merely in a state of nature, and which every man is entitled to enjoy, whether out of society or in it.' 1 Bl. 123.''

In the course of his opinion he dismissed from his consideration the case of *Atkinson* v. *Doherty Co.,* 121 Mich., 372 (1899), with the remark that all that was decided in that case was that the right of privacy dies with the person, and ''there-

fore the decision in its facts, is authoritative no further than the decision of the New York Court of Appeals in *Schuyler* v. *Curtis.*" He asserts that his conclusion is in conflict with neither of these cases, and closes the discussion of them with the remark that the right of privacy is personal.

It is obvious that a right can not be one of person and of property at one and the same time. The conclusion would seem to be that if the right of privacy exists, and has been recognized by the law, it must be as a personal tort right. It can not be a right of property. The gravamen of the offense in a violation of the right of privacy is the interference with the seclusion of the individual, and not the publication.

In the case of *Pavesich* v. *N. E. Life Ins. Co.*, *supra*, the case relied on by the plaintiff, and in the plaintiff's own case, the count charging the violation of the right of privacy is trespass *vi et armis* for a direct injury to the person, like an assault. If, however, the publication were an ingredient of the action, then the proper count would be trespass on the case for an indirect injury to the person, as is the case in libel and slander.

The right of privacy is recognized in the Georgia case as violated when the only damage alleged is mental suffering. The law divides all causes of actions into two classes with respect to damages. First, those in which the act, in and of itself, is unlawful. In this class damage will be presumed, and in the absence of proof of actual damage, nominal damages will be awarded. Second, those in which the act is regarded as lawful, unless actual damage results, and in this class pecuniary loss must be shown. In the first class may be placed all direct infringements of absolute personal or property rights, such as false imprisonment, assault, trespass on land, or conversion. In all of these, the act of false imprisonment or assault, etc., being shown, the right of action is complete, and nominal damages may be recovered of right. In the second class may be placed all actions on the case, such as nuisances, negligence in general, and libel and slander. In none of these will mental suffering alone sustain a right of action. *Owen* v. *Henman*, 1 Watts & S. 548; *Sparhawk* v. *Union Passenger Ry. Co.*, 54 Pa. St. 401; *Lynch* v. *Knight*, 9 H. L. Cas. 577; *Pollard* v. *Lyon*,

91 U. S. 225; *Dockrell* v. *Dougall,* 78 L. T. (N. S.) 840 (1898);·
*Simone* v. *Rhode Island Co.,* 28 R. I. 186. One apparent
exception exists to this rule; in libel and slander, when the
words spoken or pictures published are of such a nature that
the court can conclude, as a matter of law, that they will tend
to degrade the person or hold him up to public hatred, con-
tempt, or ridicule, or cause him to be shunned and avoided,
then pecuniary damage is presumed and the words are held
libelous or slanderous *per se.* 25 Cyc. 253.

❡If the gravamen of the action for a breach of the right of·
privacy is the publication of the information or of the picture
taken, then the injury is an indirect injury to the person, re-·
sembling libel, and, in common with that action, actual pecun-
iary damage must be alleged and proved to entitle the plaintiff
to recover.ʼ ⟨If, however, the invasion of the right of seclusion
is the gravamen of the action, the case is analogous to assault,·
and the pecuniary damages being presumed by the law, the
mental suffering sustained because of the peculiar method of·
publishing may be shown by way of aggravation of damages⟩ ·

It is evident, therefore, that the gist of the action for a breach
of the right of privacy is the violation of a right of personal
seclusion, and not the subsequent publication: (1) because·
of the definitions of the right of privacy; (2) because of the·
form of action, trespass *vi et armis,* and not trespass on the case;·
(3) because no special damage is alleged.⟩

In no opinion or dictum is the right of privacy based upon
natural right prior to the opinion in the case of *Pavesich* v. *N. E.*
*Life Ins. Co., supra.* Mr. Justice Gray, in his dissenting·
opinions in *Schuyler* v. *Curtis, supra,* and in *Roberson* v. *Roch-·*
*ester Folding Box Co., supra,* and Judge Colt in *Corliss* v. *Walker,*
64 Fed. 280, contend for the existence of the right of privacy·
as an extension of the right of property. The opinion in the
*Pavesich* case, *supra,* however, is founded upon the doctrine·
of a natural right. This was the second case, involving the
existence of the right to privacy, that was decided by a court·
of last resort. In the first case, viz., *Roberson* v. *Rochester Fold-·*
*ing Box Co., supra,* the question whether such a right existed
was decided in the negative. Commenting upon this decision,·

Mr. Justice Cobb made allusions to both the majority and minority opinions, and among others the following: "In *Roberson* v. *Rochester Folding Box Co.* (1901), 64 N. Y. App. Div. 30, decided by the appellate division of the Supreme Court of New York, it appeared that lithographic likenesses of a young woman, bearing the words, 'Flour of the Family,' were without her consent printed and used by a flour milling company to advertise its goods. The declaration alleged that in consequence of the circulation of such lithographs the plaintiff's good name had been attacked,.and she had been greatly humiliated and made sick and been obliged to employ a physician, and prayed for an injunction against the further use of the lithographs and for damages. It was held that the declaration was not demurrable. It was also held that if a right of property was necessary to entitle the plaintiff to maintain the action, the case might stand upon the right of property which every one has in his body. This case came before the Court of Appeals of New York in 1902, and the judgment was reversed. 171 N. Y. 538, 64 N. E. Rep. 442, 89 Am. St. Rep. 828. This is the first and only decision by a court of last resort involving directly the existence of a right of privacy. The decision was by a divided court; Chief Judge Parker and three of the associate judges concurring in a ruling that the complaint set forth no cause of action either at law or in equity; while Judge Gray, with whom concurred two of the associate judges, filed a dissenting opinion, in which it was maintained that the injunction should have been granted. While the ruling of the majority is limited in its effect to the unwarranted publication of the picture of another for advertising purposes, the reasoning of Judge Parker goes to the extent of denying the existence in the law of a right of privacy, 'founded upon the claim that a man has a right to pass through this world without having his picture published, his business enterprises discussed, or his eccentricities commented upon, whether the comment be favorable or otherwise.' The reasoning of the majority is, in substance, that there is no decided case either in England or in this country in which such a right is distinctly recognized; that every case that might be relied on to establish the right

was placed expressly upon other grounds, not involving the application of this right in. any sense; that the right is not referred to by the commentators and writers upon the common law or the principles of equity; that the existence of the right is not to be legitimately inferred from anything that is said by any of such writers; and that a recognition of the existence of the right would bring about a vast amount of litigation; and that in many instances where the right would be asserted it would be difficult, if not impossible, to determine the line of demarkation between the plaintiff's right of privacy and the well-established rights of others and of the public. For these reasons the conclusion is reached that the right does not exist, has never existed, and cannot be enforced as a legal right. We have no fault to find with what is said by the distinguished and learned judge who voiced the views of the majority, as to the existence of the decided cases, and agree with him in his analysis of the various cases which he reviews, that the judgment in each was based upon other grounds than the existence of a right of privacy. We also agree with him so far as he asserts that the writers upon the common law and the principles of equity do not in express terms refer to this right. But we are utterly at variance with him in his conclusion that the existence of this right cannot be legitimately inferred from what has been said by commentators upon the legal rights of individuals, and from expressions which have fallen from judges in their reasoning in cases where the exercise of the right was not directly involved. So far as the judgment in the case is based upon the argument *ab inconvenienti*, all that is necessary to be said is that this argument has no place in the case if the right invoked has an existence in the law. But if it were proper to use this argument at all, it could be said with great force that as to certain matters the individual feels and knows that he has a right to exercise the liberty of privacy, and that he has a right to resent any invasion of this liberty; and if the law will not protect him against invasion, the individual will, to protect himself and those to whom he owes protection, use those weapons with which nature has provided him as well as those which the ingenuity of man has placed within his reach.

Thus the peace and good order of society would be disturbed by each individual becoming a law unto himself to determine when and under what circumstances he should avenge the outrage which has been perpetrated upon him or a member of his family." Mr. Justice Cobb pays tribute to conservatism, but warns against its undue application, as follows: "The valuable influence upon society and upon the welfare of the public of the conservatism of the lawyer, whether at the bar or upon the bench, cannot be overestimated, but this conservatism should not go to the extent of refusing to recognize a right which the instincts of nature prove to exist, and which nothing in judicial decision, legal history, or writings upon the law can be called to demonstrate its non-existence as a legal right."

It is evident, therefore, that the court considered the right of privacy as a natural right, and that natural rights are something reserved from all governments when society was formed; in other words that there are rights reserved to the people other and above those guaranteed by the constitutions of the United States and States, and that these rights are enforceable in a court of justice. It is also obvious that, the right being reserved from all government when society was formed, its binding force on the legislature, a branch of the government, is as transcendent as it is on the judiciary, a branch of the same government.

There are no rights reserved from the government under English political theory, because the legislature is sovereign except as limited by a constitution. This is clearly seen in the acknowledged absolute powers possessed by the British Parliament. As is said by Blackstone: It is "the place where that absolute despotic power, which must in all governments reside somewhere, is intrusted by the constitution of these kingdoms" (1 Bl. Com. 160), and he instances examples wherein Parliament has shown its unlimited power by altering the succession to the crown; by changing the established religion; by modifying and recreating the constitution as in the Act of Union, and the septennial and triennial statutes. This body has also supreme judicial power. In other words, Parliament is absolutely supreme. But it needs no argument to show that

this admitted supremacy in Parliament is inconsistent with any transcendent legal rights reserved against it by the people.

The General Assembly of Rhode Island succeeded to all the powers of the British Parliament except as limited by the constitution of the United States or the State of Rhode Island.

This is the doctrine laid down by Cooley, Const. Lim. p. 104. The learned author writes, "In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the constitution of the United States.

In *Taylor* v. *Place*, 4 R. I. 324 (1856), Ames, C. J., admitted that the General Assembly originally "exercised supreme legislative, executive, and judicial power," and held an act of the legislature setting aside a verdict of the Court of Common Pleas void, because the constitution of 1842 had given all judicial power to the courts.   In *State* v. *Keeran*, 5 R. I. 497, the same judge, writing for this court, sustained an act because its "repugnancy to the constitution" was not made "plainly to appear" to him.   In *State* v. *Copeland*, 3 R. I. 33 (1854), it was held that the people themselves could not exercise powers given to the legislature, and in *Clark* v. *City of Providence*, 16 R. I. 337 (1888), the court said that "In our opinion the General Assembly has in this matter (control of fisheries and oyster beds) the authority, not simply of the English crown, but of both crown and parliament, except so far as it has been limited by the Constitution of the State or by the Constitution and laws of United States."

Since, therefore, except when expressly limited, the General Assembly exercises all of the legislative powers of sovereignty possessed by the British Parliament, which is all-powerful; and since acts of that body are tested merely by the principles of the constitution and never by standard of transcendent rights alleged to have been reserved by the individual when he entered into society, there is no room in our constitutional

theory for any transcendent right or instinct of nature except as guaranteed by that constitution. ·

A reference to the class of alleged rights now under discussion may be found in the opinion of *State* v. *McCrillis*, 28 R. I. 165 (1907), where Mr. Justice Blodgett cites with approval the case of *State* v. *Travelers Ins. Co.,* ·73 Conn. 255 (1900), denying the existence of "the vague notion of a higher law."

"The courts are not guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance." Cooley Const. Lim. 6th ed. p. 201, and see *People* v. *Mahaney*, 13 Mich. 481.

In this connection the following remarks are illuminating: "In our system the Law of Nature has formally retreated from one untenable position. . . . . We find a series of dicta, extending to the early part of the eighteenth century, to the effect that statutes contrary to 'natural justice' or 'common right' may be treated as void. This opinion is most strongly expressed by Coke, but, like many of his confident opinions, is extra-judicial. . . . . In England it was never a practical doctrine. The nearest approach to real authority for it is a case of the 27th year of Henry VI., known to us only through Fitzherbert's Abridgment, where the court held an Act of Parliament to be inoperative, not because it was contrary to natural justice, but because they could make no sense of it at all. Sir Thomas More, after the verdict against him for a novel statutory treason, and before judgment, objected that 'this indictment is grounded upon an Act of Parliament directly repugnant to the laws of God and his Holy Church,' and, 'is therefore in law, among Christian men, insufficient to charge any Christian man.' The objection was disregarded without being expressly overruled. It is easy to understand why Elizabethan lawyers refrained from adducing this example. At this day the courts have expressly disclaimed any power to control an Act of Parliament. Blackstone characteristically talks in the ornamental part of his introduction about the law of nature being supreme and, when he comes to particulars, asserts the uncontrollable power of Parliament in

the most explicit terms, following herein Sir Thomas Smith, a civilian whose political insight was much greater than that of the common lawyers of his time. It hardly needs to be pointed out that, in states where there is a distinction between a written constitution, or fundamental constitutional laws however called, and ordinary legislation, the question whether any particular act of the legislature is or is not in accordance with the Constitution depends not on any general views of natural justice, but on the interpretation of the constitutional provisions which are the supreme law of the land." Pollock's Expansion of the Common Law (1904), p. 121.

Law as defined by Blackstone is "a rule of civil conduct prescribed by the supreme power in a state, commanding what is right and prohibiting what is wrong." 1 Bl. Com. 44. Mr. Justice Story writes, "the laws of a state are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long-established local customs having the force of laws." *Swift* v. *Tyson,* 16 Pet. 18. Mr. Chief Justice Marshall, in *McCulloch* v. *Maryland,* 4 Wheat. 316 (1819), regards the making of laws as an attribute of sovereignty, and it is the stamp by the sovereign power that gives the principle its binding legal force. No one would question that it was morally wrong to impute unchastity to a female, and yet at common law, in the absence of pecuniary damage, no legal right was violated. *Pollard* v. *Lyon,* 91 U. S. 225. It is morally wrong to frighten A. by negligent conduct, and yet no legal right is violated unless physical injury results. *Simone* v. *R. I. Co.,* 28 R. I. 186. In *Burke* v. *Mechanics' Savings Bank,* 12 R. I. 513 (1880), Judge Durfee, rendering the decision for this court, enforced the common-law rule that a house built on the land of another becomes the property of that other. In the case before the court there was no question of the good faith of the transaction, and no one would doubt that, according to the principles of natural justice, the lender of the money should receive some return for the proceeds enriching the complainants; yet this court held that it was beyond the power even of the legislature to give relief. "At most," reads the opinion, "they (the complainants) were under a moral obliga-

tion to pay for the house; and a legislature cannot convert such an obligation into a debt." The same judge, in discussing the unconstitutionality of betterment law when retroactively applied, said: "Morally it may be wrong for the owner of the land to become the owner of the improvement before, as after, the law;" but, in law it is his right, to deprive him of which, retroactively, is lack of due process of law. The courts therefore clearly recognize a distinction between a moral duty or natural justice and legal rights. So, in *State* v. *Town Council of South Kingstown*, 18 R. I. 258 (1893), where the action was *mandamus* to compel the defendant to hold an election, Douglas, J., said: "When the law is made it is for the court to enforce it or to punish for disobedience of it. . . . If the law has not provided for this case then the sole remedy is with the legislature, but if the legislature has already expressed its will in the form of law the sole specific remedy is in the court."

In an opinion to the General Assembly, 3 R. I. 299 (1854), this court, in commenting on the provisions of the constitution of 1842 providing for separation of the governmental departments (Art. III, Art. IV, § 2; Art. X, §1), made use of the following language: "These provisions of the Constitution create two separate and distinct, but coördinate, departments of the government, the one vested with the legislative, the other with the judicial power of the State. Each is vested with exclusive power in its appropriate sphere. . . . . The power exclusively conferred upon the one department is, by necessary implication, denied to the other. The Court, therefore, cannot enact laws. Their power is to judge and determine, to declare what the law at any time is, not what it ought to be or shall be;" and this method of interpretation was affirmed by Judge Ames in *Taylor* v. *Place*, 4 R. I. 324 (1856). The question before the court in that case involved the power of the legislature to set aside a verdict of the court and to grant a new trial. The opinion holds that the Assembly did not have the power, because all of the judicial power was given to the courts. To show the necessity of arriving at this conclusion, Justice Ames says: "Does anyone doubt that the con-

stitution by this form of words, vests all the legislative power in the two houses of the assembly?" In *State* v. *Town Council of South Kingstown*, 18 R. I. 258 (1893), Mr. Justice Douglas, speaking for this court said: "To declare what the law is or has been is a judicial power, to declare what it shall be is legislative." (Cooley on Const. Lim. 113.) If added citations are needed to establish a universally recognized principle, they may be found in Chief Justice Marshall's famous definition that "The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construe the law," (*Wayman* v. *Southard*, 10 Wheat. 46), or the equally famous statement by Justice Woodbury, "to compare the claims of parties with the laws of the land before established, is in its nature a judicial act." (*Merrill* v. *Sherburne*, 1 N. H. 199.) It has been shown that natural justice is not law. To make it law is therefore a legislative act forbidden by the constitution to the courts of this State. Mr. Justice Blodgett, speaking for the court in *State* v. *McCrillis*, *supra*, where it was contended that an ordinance requiring the removal of snow from the sidewalk by abutting owners was unconstitutional as unequal taxation, said: "It is obvious that there is no specific provision that taxation shall be uniform and equal, expressed in the constitution of this State, and it is equally obvious that it is not our province to determine what ought to be there, but is not there." In *State* v. *Dalton*, 22 R. I. 77 (1900), where the trading-stamp law was declared unconstitutional, Mr. Justice Tillinghast, in rendering his opinion against the validity of the law, intimated that he personally did not approve of the trading-stamp business, and the opinion closes with numerous illustrations of hardship caused outside the remedy of the law. In the *License Tax Cases*, 5 Wall. 462, 469, Mr. Chief Justice Chase said: "This Court can know nothing of public policy except from the constitution and the laws, and the course of administration and decision.. . . . It cannot examine questions as expedient or inexpedient, as politic or impolitic. Considerations of that sort must in general be addressed to the legislature." See also *People* v. *Mahaney*, *supra*, where it was held that an argument

attacking an act because it violated "fundamental principles of our system" not covered by the constitution was an argument to address to the legislature.

In the *Pavesich* case, *supra*, the court found that the right of privacy is "guaranteed to persons in this state both by the Constitutions of the United States and of the State of Georgia, in those provisions which declare that no person shall be deprived of liberty except by due process of law." In another portion of the opinion, the principle of the right of privacy is found to have been guaranteed by an interpretation of the word "life." The court said: "All will admit that the individual who desires to live a life of seclusion cannot be compelled, against his consent, to exhibit his person in any public place, unless such exhibition is demanded by the law of the land. . . . Subject to the limitation above referred to, the body of a person cannot be put on exhibition at any time or at any place without his consent. The right of one to exhibit himself to the public at all proper times, in all proper places, and in a proper manner is embraced within the right of personal liberty. The right to withdraw from the public gaze at such times as a person may see fit, when his presence in public is not demanded by any rule of law, is also embraced within the right of personal liberty. Publicity in one instance, and privacy in the other, are each guaranteed. In reaching the conclusion just stated, we have been deprived of the benefit of the light that would be shed on the question by decided cases and utterances of law-writers directly dealing with the matter." The court also said: "The liberty of privacy exists, has been recognized by the law, and is entitled to continual recognition. But it must be kept within its proper limits, and in its exercise must be made to accord with the rights of those who have other liberties, as well as the rights of any person who may be properly interested in the matters which are claimed to be of purely private concern. Publicity in many cases is absolutely essential to the welfare of the public. Privacy in other matters is not only essential to the welfare of the individual, but also to the well-being of society. The law stamping the unbreakable seal of privacy upon communica-

tions between husband and wife, attorney and client, and similar provisions of the law, is a recognition, not only of the right of privacy, but that for the public good some matters of private concern are not to be made public even with the consent of those interested.   It therefore follows from what· has been said that a violation of the right of privacy is a direct invasion of a legal right of the individual.   It is a tort, and it is not necessary that special damages should have accrued from its violation in order to entitle the aggrieved party to recover. Civil Code, § 3807."

∨ It is proper to point out that the comprehensive provisions of the Georgia Civil Code, § 4929, hereinbefore set forth, are entirely lacking in our constitution or statutes.   The provisions most closely resembling the same are to be found in the constitution, Art. 1, § 5, as follows: "Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character.   He ought to obtain right and justice freely and without purchase, completely and without denial;   promptly and without delay;   conformably to the laws," and in C. P. A., § 2: "The supreme court shall have general supervision of all courts of inferior jurisdiction to correct and prevent errors and abuses therein when no other remedy is expressly provided; it may issue writs of habeas corpus, of error, certiorari, mandamus, prohibition, quo warranto, and all other *extraordinary* and *prerogative* writs and *processes* necessary for the furtherance of justice and the due administration of the law; etc."   The above provision of the constitution is contained in the declaration of rights and principles.

As was said by Ames, C. J., *In the Matter of Nichols*, 8 R. I. 54, in relation to this very section of the constitution: "Although, in a free government, every man is entitled to an adequate legal remedy for every injury done to him, yet the form and extent of it is necessarily subject to the legislative power." In other words, the constitutional provisions are not self-executing, and require legislative assistance.   In the words of Stiness, C. J., in *Crafts* v. *Ray*, 22 R. I. 183, in relation to the

following clause in Const. Art. 1, § 2: " 'All laws, therefore, should be made for the good of the whole; and the burdens of the State ought to be fairly distributed among its citizens.' The form of this clause is advisory; and not mandatory." And regarding the same clause, Ames, C. J., *In the Matter of Dorrance Street*, 4 R. I. 249, said: "We will not stop to notice the very general language and declaratory form of this clause; setting forth principles of legislation rather than rules of constitutional law—addressed rather to the general assembly by way of advice and direction, than to the courts, by way of enforcing restraint upon the law-making power." And again, "Indeed, the language in question can hardly be said to impose any restriction upon the assembly at all, except what would be imposed by the fact of our free institutions, and the general principles of constitutional law, here and everywhere in this country prevalent. Had the constitution been wholly silent upon this subject, a greater latitude could not have been given by these principles, than seems to be studiedly implied in the form, spirit and general terms of this sentence." Under our constitution, Art. III, "The powers of the government shall be distributed into three departments: the legislative, executive, and judicial." The function of adjusting remedies to rights is a legislative rather than a judicial one, and up to the present time the legislature of this State has omitted to provide a remedy for invasion of the right of privacy. Furthermore, our statutes do not contain any provisions equivalent to those of the Georgia Civil Code, § 3807, *supra:* "What are torts? A tort is a legal wrong committed upon the person or property independent of contract. It may be either—

" 1. A direct invasion of some legal right of the individual.

" 2. The infraction of some public duty by which special damage accrues to the individual.

" 3. The violation of some private obligation by which like damage accrues to the individual.

" In the former case no special damage is necessary to entitle the party to recover. In the two latter cases such damage is necessary."

But inaction upon the part of the legislature, however long continued, can not confer legislative functions upon the judiciary. Whenever public opinion becomes sufficiently strong legislative action is sure to follow; for, in general, legislation is the coinage of public opinion into statutes.

It is a well-established rule of constitutional interpretation as laid down by this court that the terms of the constitution must be interpreted as they were understood at the time of the adoption of the present constitution. Thus in *State* v. *Nichols*, 27 R. I. 69 (1905), Mr. Justice Blodgett, speaking for this court, held that the word "infamous" did not include a crime punishable with imprisonment for any period less than one year, because the statute in force in 1843 did not debar persons, unless thus convicted, from certain political and civil rights. So in *Shaw* v. *Silverstein*, 21 R. I. 500 (1899), it was held that the right of trial by jury did not extend to the facts set forth in an affidavit annexed to the writ of arrest, because the procedure by affidavit was not in existence at the time of the adoption of the constitution. The same principle applies in *Gunn* v. *Union R. R. Co.*, 23 R. I. 289 (1901), upholding the right to grant a new trial for a verdict contrary to the evidence. In *Conley* v. *Woonsocket Institution for Savings*, 11 R. I. 147 (1875), Chief Justice Durfee held that Article I, section 5, of the State constitution, declaring that the plaintiff ought to obtain right and justice freely, was borrowed from the Magna Charta, and that as in England it did not prohibit judicial fees, so it would not in Rhode Island. This court has therefore held that it is not at liberty to construe into the constitution new principles which did not exist at the time of the adoption of the constitution; and further, that when the form of words used in the constitution is borrowed from an older source, it comes laden with its previous meaning. As a matter of common knowledge, the clauses under discussion (Fourteenth Amend. U. S. Const. and Art. 1, § 10, R. I. Const.) were borrowed from the thirty-ninth article of the great charter: "No freeman shall be taken, or imprisoned, or disseized or outlawed, or banished, or in any ways destroyed; nor will we pass upon him, or send upon him, unless by legal judgment of

his peers, or by the law of the land." The words corresponding to "liberty" in this first pronouncement are "taken," "imprisoned," "outlawed," and "banished," and are not confined to mere freedom from incarceration ("imprisonment").

Blackstone defined "personal liberty" as the "power of locomotion, of changing situation, of removing one's person to whatever place one's inclination may direct, without imprisonment or restraint unless by course of law." 1 Bl. Com. 134. From this it would logically follow that the right of personal liberty included not only the right to go where a person pleased, but also to maintain himself in a lawful manner while there, "to live and work where he chose, to earn his livelihood by a lawful calling, enter into contracts essential to carry out his avocation, as well as mere freedom from incarceration." Judge Peckham, in *Allgeyer* v. *Louisiana*, 165 U. S. 578. The same learned judge defined the term liberty in essentially the same manner in *People* v. *Gillson*, 109 N. Y. 399, as meaning "the right not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation." This was the definition adopted by this court in *State* v. *Dalton*, 22 R. I. 77 (1900), in which it was held that a law prohibiting the gift of a stamp entitling the purchaser of a given article to obtain another specified article from a third party was a deprivation of liberty because the legislature has no right to prohibit a man from "carrying on his business in his own way, provided always, of course, that the business and the mode of carrying it on are not injurious to the public, and provided, also, that it is not a business which is affected with a public use or interest." It is true, therefore, that the idea underlying "liberty" would undoubtedly prohibit another from exhibiting the body of one without his consent. But it is also true that the exhibition of a picture of one does not restrain his movements, does not curtail his choice of occupation, nor abridge his freedom of contract.

It would be a work of supererogation to cumber this opinion with an analysis of the English and American cases, prior to the

cases of *Roberson* and *Pavesich, supra*, to show that the same are not authority in support of the existence of the right to privacy, because the same have been carefully reviewed, not only in the cases above mentioned, but also in the article in the *Harvard Law Review* already referred to and in the note to the case of *Pavesich* v. *New England Mut. Life Ins. Co.*, 2 Am. & Eng. Ann. Cas. 574.

We pass, therefore, to the consideration of the claim of Mr. Justice Cobb that the principle of the right of privacy was well developed in the Roman law, and from there was carried into the common law, where it appears in various places. He finds that "shouting until the crowd gathered round one," or "following an honest woman or young boy or girl," or "attracting attention to another as he was passing along the highway or standing upon his private grounds," were actionable at Roman law. The recognition of the principle underlying these actions in the Roman law is found in the common law in the law of nuisance both public and private; for example, public scolds and eaves-droppers. Lord Coke is found to have sanctioned it in *Semaynes case,* 5 Coke, 91, when he gives force to the maxim that "Every man's house is his castle." So, too, the same court claims, every constitution sets its approval on a *tort* right of privacy when it prohibits *unreasonable search*. The law of evidence contributes to this ever-present right "to be let alone" when it forbids husband and wife to divulge privileged communications, and sets a seal upon the knowledge of an attorney gained from his client. From these instances the court concludes that the legal principles of the Roman law are introduced into the common law and that "liberty of privacy has been recognized by the law and is entitled to continual recognition."

It is difficult to discover how the theory of public nuisance, the first principle of which is that a private individual can not remedy his fancied wrong, is made to support an absolute right of privacy such as has been described in the Roman law and sanctioned in the Georgia case. Blackstone defines a nuisance as "anything done to the hurt or annoyance of the lands, tenements, or hereditaments of another," 3 Bl. Com. Sharwood's ed. *216. The very theory of nuisance is the doing of

something intrinsically lawful in a manner damaging to others, and it is the resultant damage that creates the wrong. The right of privacy, on the other hand, which the Supreme Court of Georgia seeks to establish, is an absolute tort right, the merest interference with which is an actionable wrong. In nuisance not only must special damages be alleged to sustain an action, but it is well settled that mental suffering alone will not constitute damage sufficient to sustain an action. *Owen* v. *Henman, supra; Sparhawk* v. *Union Passenger Ry. Co., supra,* a branch of a similar rule obtaining in libel and slander cases not actionable *per se* where special damage must be shown. *Lynch* v. *Knight, supra; Pollard* v. *Lyon, supra; Dockrell* v. *Dougall, supra;* and in negligence cases, *Simone* v. *Rhode Island Co., supra.* In the right of privacy, however, in the Georgia case, and in the case now before the court, no damage is alleged other than mental suffering. The law of nuisance not only does not recognize a right of privacy but is in theory incompatible with it.

The rule, "Every man's house is his castle," does not rest on a right of personal privacy; otherwise the same immunity would follow the person when without his house or when the officer had found the outer door open and broke in an inner panelling. The same is true of provisions as to unreasonable searches based squarely on this old maxim and now defended by the constitution. So, too, it is apparent that the divulging of communications between husband and wife rests on some principle other than the right of privacy, else the bar would still continue when testifying against each other in a divorce suit. These rules are and always have been based on principles of sound public policy, irrespective of the wishes, or desires, or interests of the persons affected. It is not claimed that these instances were ever based on a right of privacy. The contention is, at best, that they might be or ought to be, and that because certain results may be obtained by applying the theory of absolute right of privacy, that therefore a right of privacy is established. Such an argument is fallacious, and none of the instances given recognize or support the right of privacy in the common law.

Every exponent of the right of privacy cites, as an authority in support of his contentions, one sentence in Cooley on Torts, page 29, where the learned author is discussing the right of personal immunity, and the sentence is as follows: "The right to one's person may be said to be a right of complete immunity: to be let alone." The meaning of this sentence is amply explained by the one immediately following: "The corresponding duty is, not to inflict an injury, and not, within such proximity as might render it successful, to attempt the infliction of an injury. In this particular the duty goes beyond what is required in most cases; for usually an unexecuted purpose or an unsuccessful attempt is not noticed." The paragraph is given over entirely to a discussion of the doctrine of assault. The author is not therefore ushering in a new right of ,complete immunity. The right "to be let alone" refers unmistakably to the right to be .free from bodily injury, or from a reasonable fear of bodily injury, at the hands of a fellow-being.

The principle underlying the right of privacy is not analogous to that upon which assault is based. In *State* v. *Baker*, 20 R. I. 275 (1897), this court, speaking through Mr. Justice Tillinghast, adopted the definition of assault, given by Mr. Bishop, as "any unlawful physical force, partly or fully put in motion, creating a reasonable apprehension of immediate physical injury to a human being." 2 Bish. Cr. L. § 23, and it was held in that case that the firing of a loaded pistol at a man was an assault, even though the intention of the person firing was merely to scare the person shot at, because "it (the firing) was an act which was well calculated to inflict serious personal injury; and from such an act the law implies malice." In *State* v. *Hunt*, 25 R. I. 69 (1903), it was held that an assault "consists in an offer to do bodily harm, made by a person who is in a position to inflict it." Numerous other definitions of both civil and criminal assault are found collected in 3 Cyc. 1020 and 1066. An essential element in all is a "reasonable apprehension of immediate physical injury," and the movement, however threatening, which does not produce the fear of physical harm is not an assault. *Tuberville* v. *Savage*, 1 Mod. 3; 1 Ames. Cas. Torts, 2. Apprehension of immediate physical harm is

not an essential element of the right of privacy. But the incompatibility between the principle of assault and that of the right of privacy is most strikingly brought out by the familiar rule that words alone can never constitute an assault, Cooley Torts, 167. If words can not constitute an assault, how then can writings; and if writings can not, how could the publication of a picture? It would seem reasonable to conclude that the principle of the right of privacy finds no support in the doctrine of assault.

It has also been suggested that the principle of the right of privacy finds support in the law of libel. Enough has already been said to show the fallacy of this contention.

The foregoing considerations, together with an examination of the authorities, lead us to the same conclusion as that reached by a majority of the court in *Roberson* v. *Rochester Folding Box Co.*, *supra* viz., (p. 556), "that the so-called 'right of privacy' has not as yet found an abiding place in our jurisprudence, and, as we view it, the doctrine cannot now be incorporated without doing violence to settled principles of law by which the profession and the public have long been guided."

It may be proper to state, however, that, since the rendition of the foregoing decision, the legislature of the State of New York has enacted chapter 132 of the Laws of New York, entitled: "An act to prevent the unauthorized use of the name or picture of any person for the purposes of trade," which went into effect September 1st, 1903, whereby persons offending against its provisions are not only declared to be guilty of a misdemeanor, but also are made liable, in civil actions, at the suit of persons injured by such unauthorized use of name or picture, to respond in damages, including exemplary damages, for such injury.

The constitutionality of this statute has been sustained by the Court of Appeals of New York in the case of *Rhodes* v. *Sperry & Hutchinson Co.* (Oct. 23, 1908), 85 N. E. Rep. 1097.

As we have been unable to discover the existence of the right of privacy contended for, we must answer the first question, certified to us, in the negative.

The second question, considered solely with reference to the first count of the declaration,—the second count for libel being

insufficient for that purpose, as hereinbefore set forth,—must also be answered in the negative.

Having thus decided the questions certified to us, we herewith send back the papers in the cause with our decision certified thereon, to the Superior Court, for further proceedings.

*Bassett & Raymond,* for plaintiff.
*Russell W. Richmond,* of counsel.
*Edwards & Angell,* for defendant.
*Seeber Edwards and Francis B. Keeney,* of counsel.